Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 21, 2003        Decided April 18, 2003

No. 01-1454

STANFORD HOSPITAL AND CLINICS, SUCCESSOR TO
UCSF STANFORD HEALTH CARE,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 715,
INTERVENOR

————

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

————

*Laurence R. Arnold* argued the cause for petitioner. With him on the briefs was *John H. Douglas*.

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Steven B. Goldstein*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Margaret A. Gaines*, Supervisory Attorney.

*Benjamin I. Sachs* argued the cause for intervenor. With him on the brief were *Judith A. Scott* and *Craig Becker*.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Petitioner, a hospital, adopted a policy prohibiting its employees from, among other things, soliciting and distributing materials to (1) fellow employees in areas adjacent to patient units and (2) all nonemployees throughout the hospital. Finding that Petitioner failed to demonstrate that such activities were likely to disturb patients, the National Labor Relations Board concluded that the policy was overbroad in violation of the National Labor Relations Act. The Board also found that Petitioner committed an unfair labor practice when it discriminatorily evicted a nonemployee union organizer from its premises. Finding the Board's decision regarding the solicitation and distribution policy consistent with Board precedent and supported by substantial evidence, we deny the petition for review and grant the Board's cross-application for enforcement. Because the Board's eviction decision is contrary to law, however, we grant the petition with respect to that issue and deny the Board's cross-application.

I.

In 1997, the Stanford University Medical School and the University of California at San Francisco merged certain of their medical facilities into a new entity known as UCSF–Stanford Health Care (USHC). The events at issue in this case occurred on the USHC South facility, located on Stanford's Palo Alto, California campus. Employing some 7,000

persons, including approximately 1,400 service employees, the facility consists of two hospitals:  the 663–bed Stanford Hospital Center and the 162–bed Lucile Packard Children's Hospital.

In late November 1997, following consummation of the USHC merger, Intervenor Service Employees International Union, Local 715 began a drive to organize the hospital's service and maintenance employees.  During the campaign, which culminated in a majority vote in favor of representation, hospital employees and full-time union organizers regularly solicited employees and nonemployees both inside and outside the hospital and distributed union literature to them.

Responding to the union's solicitation activities, USHC promulgated an employee solicitation and distribution policy intended to "avoid disrupting patient care and to prevent disturbing our patients and their families."  *UCSF Stanford Health Care & Serv. Employees Int'l Union, Local 715*, 335 N.L.R.B. No. 42, at 23 (Aug. 27, 2001).  The policy prohibited (1) solicitation of employees on hospital premises during work time and in "patient care areas at any time";  (2) literature distribution on hospital premises during work time, and in work areas at any time;  and (3) solicitation of nonemployees or distribution of literature to them at all times throughout the entire facility.  *Id.*

The policy defined patient care areas as including "patient rooms, patient treatment and procedure rooms or areas, patient admitting or registration areas, patient waiting rooms, lounges used by patients and their families or visitors, and the hallways immediately adjacent to all such areas."  *Id.* This definition of patient care areas includes what the parties refer to as "patient units."  Reached in each facility by walking down a hallway and passing through a set of double doors, patient units contain:  patient rooms; treatment rooms for radiology, surgery, and other medical purposes;  and lounges or sitting areas for use by patients, families, and visitors.  Areas outside patient units but covered by the patient care area definition include a separate set of lounges and waiting areas that patients, families, and visitors also use.

In unfair labor practice charges filed with the Board, the union claimed that the solicitation and distribution policy violated sections 7 and 8(a)(1) of the National Labor Relations Act. 29 U.S.C. §§ 157, 158(a)(1). Following a two-day evidentiary hearing, an administrative law judge upheld the policy as applied to patient units, admitting and registration areas, and day rooms used by employees. *UCSF Stanford Health Care*, 335 N.L.R.B. No. 42, at 41. With respect to hallways and lounges outside patient units, however, the ALJ found that because USHC had failed to demonstrate that solicitation and distribution activities in those areas were likely to disturb patients, the policy was overbroad in violation of NLRA sections 7 and 8(a)(1). *Id.* at 46–49. According to the ALJ, the prohibition against soliciting nonemployees and distributing materials to them was also overbroad because USHC had failed to demonstrate "special circumstances," such as a likelihood of patient disturbance, that would justify the ban. *Id.* at 49–50. Finally, the ALJ found that USHC violated NLRA section 8(a)(1) when, during the organizing campaign, it evicted several nonemployee union organizers from the hospital's premises, including one Bruce Harland, whose eviction is at issue in this case. *Id.* at 38. The Board affirmed. *Id.* at 1.

Stanford Hospital and Clinics, the successor to USHC (the merger was dissolved in April 2000) now petitions for review, challenging the Board's conclusion that its solicitation and distribution policy and its eviction of Harland violated the NLRA. The Board cross-applies for enforcement. Because Stanford does not challenge the Board's finding that it violated NLRA section 8(a)(1) by excluding and attempting to exclude full-time union organizers other than Harland, we grant the Board's petition to enforce that portion of its order. *See Int'l Union of Petroleum & Indus. Workers v. NLRB*, 980 F.2d 774, 778 n.1 (D.C. Cir. 1992) (unchallenged Board findings are entitled to summary enforcement).

## II.

In reviewing Stanford's challenges, we "give considerable deference to the Board's interpretation of the NLRA, and

must accept the Board's determinations if they are supported by substantial evidence." *Lucile Salter Packard Children's Hosp. v. NLRB*, 97 F.3d 583, 588 (D.C. Cir. 1996). Decisions regarding witness credibility and demeanor " 'are entitled to great deference, as long as relevant factors are considered and the resolutions are explained.' " *Breakfast Prods., Inc. v. NLRB*, 901 F.2d 1130, 1130 (D.C. Cir. 1990) (unpublished disposition) (quoting *NLRB v. Louton, Inc.*, 822 F.2d 412, 414 (3d Cir. 1987)). With this highly deferential standard of review in mind, we consider each of Stanford's challenges.

### *Solicitation and Distribution Activities Directed at Fellow Employees in Non-Patient-Care Areas*

NLRA section 7 guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7]." 29 U.S.C. § 158(a)(1). The Supreme Court has repeatedly recognized that the right of employees under section 7 "necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491 (1978). Employees' right to "self-organization at the jobsite," however, is not unlimited, conflicting as it does with employers' property rights and managerial interests. Thus, because "the undisputed right of self-organization assured to employees under the . . . Act and the equally undisputed right of employers to maintain discipline in their establishments . . . are not unlimited in the sense that they can be exercised without regard to any duty which the existence of rights in others may place upon employer or employee," the Board must "work[ ] out an adjustment" between these competing rights. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797–98 (1945). "Accommodation between [employee-organization rights and employer property rights]," the Court later ex-

plained, "must be obtained with as little destruction of one as is consistent with the maintenance of the other." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956).

The Supreme Court has allowed the Board to implement these section 7 prescriptions by adopting a series of presumptions regarding restrictions on solicitation and distribution activities. *Republic Aviation Corp.*, 324 U.S. 804–05 (explaining that Board presumption is like "a statutory presumption or one established by regulation"). For example, "restrictions on employee solicitation during nonworking time, and on distribution during nonworking time in nonworking areas, are violative of § 8(a)(1) unless the employer justifies them by a showing of special circumstances which make the rule necessary to maintain production or discipline." *Beth Israel Hosp.*, 437 U.S. at 492–93. Alternatively, an employer's nondiscriminatory ban on nonemployee union organizers' access to the employer's property for the purpose of solicitation and distribution is presumptively lawful unless the union demonstrates that employees are not otherwise accessible to union organizers. *See Lechmere, Inc. v. NLRB*, 502 U.S. 527, 532 (1992).

In *St. John's Hospital & School of Nursing, Inc.*, 222 N.L.R.B. 1150 (1976), the Board adopted special presumptions regarding solicitation and distribution activities in hospitals. Because "the primary function of a hospital is patient care and [because] a tranquil atmosphere is essential to the carrying out of that function," the Board allows hospitals to "impos[e] somewhat more stringent prohibitions on solicitation than are generally permitted." *Id.* at 1150. Under *St. John's*, hospitals may ban solicitation and distribution activities even during nonwork time in "patient care areas, such as the patients' rooms, operating rooms, and places where patients receive treatment" because "[s]olicitation at any time in those areas might be unsettling to the patients." *Id.* Outside patient care areas, however, "a hospital may ban solicitation and distribution only as necessary to avoid disruption of health-care operations or disturbance of patients." *Brockton Hosp. v. NLRB*, 294 F.3d 100, 103 (D.C. Cir. 2002) (internal quotation marks and citation omitted). The Supreme Court has repeatedly upheld these solicitation and distribution rules.

*See Beth Israel Hosp.*, 437 U.S. 483; *Baptist Hosp. v. NLRB*, 442 U.S. 773 (1979).

In this case, the sole issue before us is whether Stanford may, in order to protect patients from disturbance, prohibit solicitation and distribution activities in hallways and lounges outside patient units. According to Stanford's four witnesses, patients and their families frequent these areas and are disturbed by non-patient-care-related activities, including employee solicitation and distribution activities directed at fellow employees. Although Stanford need demonstrate only "a likelihood of, not actual, . . . [patient] disturbance," we conclude, as we did in *Brockton Hospital* (which involved a similar policy) that "substantial evidence supports the Board's decision that the Hospital did not meet even this standard." 294 F.3d at 104. In reaching this conclusion, we rely on three particularly persuasive elements of the ALJ's analysis.

First, the ALJ doubted the credibility of Stanford's witnesses because, although they testified that *all* non-patient-care-related activities—such as eating, sleeping, and conversations on controversial subjects in lounges and waiting areas—disturb patients, they were unable to explain why Stanford restricted only solicitation or distribution, and not all other non-patient-care-related activities. "These witnesses," the ALJ explained, "did not differentiate the actions of [Stanford's] employees during solicitation and distribution activities and their allowable conversations and distributions, even if they involved controversial subjects." *UCSF Stanford Health Care*, 335 N.L.R.B. No. 42, at 46. Given the breadth of the witnesses' claims, the ALJ was troubled that Stanford had neither "ban[ned] employees from the waiting areas outside the units, the registration area or the hallways" nor prohibited employees from eating or sleeping in lounges or waiting rooms. *Id.* Perhaps most tellingly, the ALJ found that Stanford itself posted anti-union materials discussing the possibility of strikes "without limiting the areas of . . . distribution." *Id.*

The Supreme Court's *Beth Israel Hospital* decision supports the ALJ's reasoning. Upholding a Board invalidation

of a ban on solicitation in an employee cafeteria, the Court observed that the hospital's differential treatment of (1) solicitation activities and (2) other activities equally likely to disturb patients undercuts the hospital's justification for the ban. "Evidence that petitioner adopted a less restrictive approach to behavior in the cafeteria which would be at least as disquieting to patients as union solicitation," the Court explained, "further supports the Board's conclusion that the risk of harm to patients is not so great as to justify an unlimited restriction." *Beth Israel Hosp.*, 437 U.S. at 502 n.20.

Stanford insists that there is a recognized distinction between union solicitation and distribution on the one hand and mere conversation on the other, and that Stanford should not be forced to ban the latter in order to regulate the former. Although it is certainly true that "solicitation has a disruptive force quite apart from its contribution to noise level and overcrowding," *Baylor Univ. Med. Ctr. v. NLRB*, 578 F.2d 351, 356 (D.C. Cir. 1978), Stanford's argument misses the point. Neither the ALJ nor the Board held that Stanford could ban solicitation and distribution activities in non-patient-care areas only if it also banned all non-patient-care-related activities and conversations. Indeed, the Board has never required the adoption of such sweeping bans as a condition for approving limitations on solicitation and distribution activities. Rather, the ALJ's decision rests on the tension between Stanford's witnesses' testimony that "any activity that does not appear to focus on patient care is upsetting to families" and the hospital's failure to "include all such behavior [in] its ban." *UCSF Stanford Health Care*, 335 N.L.R.B. No. 42, at 46. "This failure," the ALJ concluded, "was unexplained[,] and the basis for its selectivity not presented and therefore unjustified." *Id.*

Second, the ALJ found that Stanford failed to produce "specific evidence" demonstrating that "all . . . [patient] waiting areas were used by patients or their families." *Id.* "Assuming some use by patients and their families of some of these rooms," the ALJ explained, "the frequency of such use or the relation to immediate patient care was not clearly

established by [Stanford]." *Id.* Indeed, Stanford provided no evidence of patients using the rooms either "after 8 p.m. when visiting hours ended at Stanford Hospital" or late in the evening at Lucile Packard when patients and family members were unlikely to be present. *Id.* at 46–48. Nor did Stanford "present[ ] any evidence concerning the frequency of patients using hallways and waiting areas outside the units to walk as part of their recovery regimen or otherwise." *Id.* at 47.

Our decision in *Brockton Hospital* supports the ALJ's analysis. There, we sustained the Board's invalidation of a ban on distribution activities in a hospital's vestibule because the hospital had failed to produce evidence that patients were likely to observe the activity. "The Hospital's experts testified that if patients saw or heard about the content of the literature they would be upset; the Hospital presented no reason, however, to believe patients were likely to learn of the content of the literature." *Brockton Hosp.*, 294 F.3d at 104 (internal citation omitted). To be sure, unlike in *Brockton Hospital*, the record here contains some evidence that doctors spoke to patients in waiting areas and that patients used some waiting areas and hallways outside patient units. But *St. John's* requires more than mere patient presence in areas covered by a solicitation and distribution ban. In order to satisfy the *St. John's* patient-disturbance test, hospitals must establish both that patients will witness employee solicitation and that they will likely be disturbed by it. Here, not only has Stanford failed to demonstrate the frequency with which patients use hallways and waiting areas outside patient units, or that they even use these areas, but the ALJ doubted the credibility of Stanford's claim that employee solicitation and distribution activities would disturb patients. *See supra* pp. 7–8.

Stanford argues that the ALJ effectively required it to demonstrate patient use of each hallway and lounge twenty-four hours a day, seven days a week. This is true, but that obligation stems from Stanford's decision to make its policy applicable in non-patient-care areas twenty-four hours a day, seven days a week. If Stanford wished to escape that burden, it could have done so by adopting a less comprehen-

sive ban on solicitation and distribution activities. For example, it could have limited its policy to the periods of time during the day when patients and their visitors were most likely to be in hallways and lounges outside patient units. But having made its policy effective twenty-four hours a day, seven days a week, Stanford had an obligation to demonstrate "that solicitation is likely either to disrupt patient care *or* disturb patients." *Baptist Hosp.*, 442 U.S. at 782 n.11. In *NLRB v. Southern Maryland Hospital Center*, 916 F.2d 932 (4th Cir. 1990), the Fourth Circuit reached a similar result, upholding the Board's invalidation of a ban on distribution activities at a hospital entrance because the hospital had failed to demonstrate that patients used the entrance early in the morning when leafletting occurred. *Id.* at 935.

Third, the ALJ found that USHC failed to produce "evidence of any complaints generated by its employees['] solicitation and distribution activities." *UCSF Stanford Health Care*, 335 N.L.R.B. No. 42, at 48. The ALJ reached this conclusion based on record evidence that during the eleven months in which employees engaged in solicitation and distribution activities, USHC received some 1,200 complaints about Stanford Hospital and 300 about Lucile Packard, but "few if any" involved union solicitation or distribution. Although Stanford must show only a likelihood of patient disturbance—not actual patient disturbance—the Supreme Court found in *Beth Israel Hospital* that the absence of complaints during eight months of union activity, a period three months shorter than the union activity at USHC, was "especially telling." *Beth Israel Hosp.*, 437 U.S. at 502; *see also Brockton Hosp.*, 294 F.3d at 104 (absence of complaints undermines hospital's argument that permitting union activity would create a likelihood of disturbance).

Together, these three aspects of the ALJ's decision—her doubts about witness credibility, her finding that Stanford failed to show patient use of all hallways and lounges outside patient units, and her finding that few if any complaints received by the hospital during the organizing campaign involved solicitation and distribution activities—are more than sufficient to support the Board's conclusion that Stanford

failed to demonstrate that solicitation and distribution activities directed at fellow employees outside patient units were likely to disturb patients. Stanford insists, however, that its evidence is "consistent with evidence already deemed by this court and the Supreme Court sufficient as a matter of law." Petitioner's Br. at 36. In support of this proposition, Stanford cites *Baptist Hospital* and our first and third *Baylor University Medical Center* decisions, but it ignores significant differences between those cases and this one.

In *Baptist Hospital,* the Supreme Court denied enforcement of a Board decision invalidating a solicitation ban that applied to corridors and sitting rooms on patient floors. Stanford calls our attention to the following statement in the Court's opinion:

> The increased emphasis in modern hospitals on the mobility of patients as an important aspect of patient therapy is well known, and appears to be a part of patient care at the Hospital. Small public rooms or sitting areas on the patient-care floors, as well as the corridors themselves, provide places for patients to visit with family and friends, as well as for doctors to confer with patients' families—often during times of crisis.

*Baptist Hosp.*, 442 U.S. at 784 (internal citations omitted). We do not read this statement, as Stanford does, to apply to all hospitals without regard to the specific evidence before the Board. The record in *Baptist Hospital* contained evidence that patients actually used waiting areas outside immediate patient care areas. And as the Supreme Court pointed out in a sentence not quoted by Stanford, the record also contained evidence that "[p]atients in the most critical and fragile conditions often move or are moved through these corridors, either en route to treatment in some other part of the Hospital or as part of their convalescence." *Id*. By contrast, the ALJ here found that Stanford failed to demonstrate the extent to which patients use hallways and waiting areas covered by its policy. *Baptist Hospital* differs from this case in a second important respect: Whereas the ALJ in this case

doubted the credibility of Stanford's claim that employee solicitation and distribution actually would disturb patients, in *Baptist Hospital* the Court observed—in a sentence only partially quoted by Stanford—that "[n]othing in the evidence before the Board provided any basis . . . for doubting the accuracy of the [witnesses'] statements . . . that union solicitation in the presence or within the hearing of patients may have adverse effects on their recovery." *Id.*

Our *Baylor University* decisions are equally unhelpful to Stanford. In the first decision, we upheld a solicitation and distribution ban that applied to a hospital corridor. *Baylor Univ. Med. Ctr. v. NLRB*, 578 F.2d 351 (D.C. Cir. 1978). But there, unlike here, the hospital had presented significant evidence about the congested state of its corridors. Witnesses testified:

> [S]ome 15,000–20,000 persons entered the hospital each day and that the passageways and corridors were "as crowded as the main streets of downtown Dallas." It is remarkable that conditions at Baylor are not more chaotic than they are; certainly the imposition of any additional sources of potential disruption should only be required reluctantly and after a far more detailed analysis than the NLRB devoted to this particular case.

*Id.* at 355. Contrary to Stanford's claim, our third *Baylor University* decision, which declined to enforce a Board order invalidating a partial ban on solicitation and distribution activities in a hospital cafeteria, did not rest on "physician testimony regarding the psychological vulnerability of inpatients (and family members) in acute care hospitals, and the importance for inpatients to feel that hospital staff 'really cares totally for their well being.'" Petitioner's Br. at 32 (quoting *Baylor Univ. Med. Ctr. v. NLRB*, 662 F.2d 56, 62 n.8 (D.C. Cir. 1981)). Rather, it rested on the Board's disregard of "the testimony of several witnesses who testified that solicitation in the cafeteria would disrupt patients and visitors." *Id.* Stanford presented no such evidence.

*Solicitation and Distribution Activities*
*Directed at Nonemployees*

The Board found the ban on solicitation of nonemployees anywhere on Stanford's property to be overbroad because Stanford had failed to demonstrate that the ban was needed to protect patients. Challenging this conclusion, Stanford argues that employees have no right to solicit nonemployees and distribute union materials to them, and that even if they do, this right is outweighed by Stanford's right to provide a suitable environment for its patients. Our resolution of this issue is controlled by *Eastex, Inc. v. NLRB*, 437 U.S. 556 (1978), in which the Supreme Court explained that when an employer is charged with interfering with section 7 activity by prohibiting employees from engaging in union activity on its property, two questions arise:

> The first is whether, apart from the location of the activity, [the restricted activity] is the kind of concerted activity that is protected from employer interference by §§ 7 and 8(a)(1) of the National Labor Relations Act. If it is, then the second question is whether the fact that the activity takes place on [the employer's] property gives rise to a countervailing interest that outweighs the exercise of § 7 rights in that location.

*Id.* at 563.

As to the first *Eastex* question, not only does section 7 protect employee rights to solicit fellow employees and to distribute materials to them, *see supra* pp. 5–7, but neither this court nor the Board has ever drawn a substantive distinction between solicitation of fellow employees and nonemployees. To the contrary, both we and the Board have made clear that NLRA sections 7 and 8(a)(1) protect employee rights to seek support from nonemployees. For example, in *Davis Supermarkets, Inc. v. NLRB*, 2 F.3d 1162 (D.C. Cir. 1993), we held that employees are entitled to "distribut[e] leaflets to customers" on their employer's property, *id.* at 1177, and in *Santa Fe Hotel & Casino*, 331 N.L.R.B. 723 (2000), the Board affirmed an ALJ decision stating that "the

fact that the off-duty employee distributions ... were to customers rather than to other employees appears to be a distinction without a difference and is an irrelevant consideration," *id.* at \*730. *See also NCR Corp.*, 313 N.L.R.B. 574, 576 (1993) ("The right of employees to distribute union literature during nonworktime and nonwork areas is not limited only to distribution to prospective union members. Employees have a statutorily protected right to solicit sympathy, if not support, from the general public, customers, supervisors, or members of other labor organizations."); *cf. NLRB v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 63 (1964) (holding that NLRA section 8(b)(4)(ii)(B) does not prohibit "peaceful picketing ... limited ... to persuading Safeway customers not to buy Washington State apples when they traded in Safeway stores").

Stanford insists that "[t]he Supreme Court has long recognized ... a clear distinction in the strength of the section 7 rights implicated by communication purely among employees, and communication between nonemployees and employees." Petitioner's Reply Br. at 22. This proposition, Stanford claims, "follows logically" from *Lechmere*, which holds that nonemployee union organizers otherwise able to communicate with employees can be excluded from an employer's property. Stanford misreads *Lechmere*. Having nothing to do with whether employees may solicit nonemployees, that decision turns on the fact that the NLRA's plain language "confers rights only on *employees*, not on unions or their nonemployee organizers." *Lechmere*, 502 U.S. at 532 (emphasis in original). What matters under *Lechmere* is not the identity of a solicitor's intended audience (nonemployees in this case), but whether the solicitor is employed by the property owner or otherwise lawfully on the employer's property. Nothing in *Lechmere* supports Stanford's contention that employees have no right to solicit and distribute to nonemployees.

Because section 7 entitles employees to solicit nonemployees, the validity of Stanford's policy turns on the second *Eastex* question: Does the fact that the solicitation and distribution activities took place on the employer's property give rise to countervailing employer interests that outweigh

employee section 7 rights? Echoing its justification for banning solicitation and distribution activities outside patient units, Stanford argues that its employees' right to solicit nonemployees is outweighed by the need to "respect . . . the privacy and sensitivity of patients." Petitioner's Br. at 16. For essentially the same reasons we have sustained the Board's conclusion that Stanford failed to establish a likelihood of patient disturbance that could justify its more limited ban on solicitation of fellow employees, we agree with the Board that Stanford failed to demonstrate that its interest in patient privacy and well-being outweighs its employees' section 7 rights to solicit nonemployees. The ALJ explained:

> The rule [banning all solicitation of nonemployees and distribution to them] is so broad as to encompass all lawful employee[s'] petitioning of public support regardless of where such solicitation or distribution occurs on [Stanford's] property. . . . The ban clearly bars protected activity throughout the hospitals and other areas defined only as [Stanford's] property, without establishing a special need for such a broad ban. There was no showing patients would receive such literature outside the hospital buildings or in the cafeterias, gift shops, maintenance or utility areas. Employees, absent a showing of special circumstances, are not barred from standing in front of hospitals and handing out literature concerning a labor issue. [Stanford] has failed to demonstrate the existence of special circumstances in this case.

*UCSF Stanford Health Care*, 335 N.L.R.B. No. 42, at 50. The ALJ also observed that Stanford presented no persuasive evidence that "such a broad ban is necessary to protect patients," nor that "regular leafletting by the Union outside the Hospital during the organizing campaign prior to the ban . . . had any adverse effect upon patient care." *Id.*

Contesting none of these findings, Stanford maintains that even if section 7 allows solicitation of nonemployees, employees may not exercise such rights in hospitals. In support,

Stanford first cites *Beth Israel Hospital*'s statement that "a rule forbidding any distribution to or solicitation of nonemployees would do much to prevent potentially upsetting literature from being read by patients." *Beth Israel Hosp.*, 437 U.S. at 503 n.23. This statement, however, is dicta, for the question before the *Beth Israel Hospital* Court had nothing whatsoever to do with employer authority to restrict solicitation of nonemployees. Equally important, nothing in *Beth Israel Hospital* suggests that the Court intended to sanction hospital rules that prohibit solicitation and distribution activities unlikely to affect patients or patient care. Quite to the contrary, the Court *sustained* the Board's *St. John's* presumption under which employers seeking to limit solicitation and distribution activities must demonstrate a likelihood of patient disturbance.

Stanford also cites *Aroostook County Regional Ophthalmology Center v. NLRB*, 81 F.3d 209 (D.C. Cir. 1996), which held that a small medical practice may lawfully prohibit its employees from discussing (1) confidential patient medical information with third parties and (2) grievances within earshot of patients. That decision hardly supports Stanford's claim that it may prohibit its employees from discussing their own terms and conditions of employment with nonemployees. Moreover, in upholding the policy at issue in that case, we relied on the existence of two considerations not present here: that the employer "does not operate large facilities where the distinction between patient and non-patient areas can easily be discerned," and that, "[i]n a small medical practice[,] . . . the employer has unique concerns about employees acting in a way that might disturb patients." *Id.* at 213. As Stanford concedes, it has hundreds of beds and thousands of employees.

Finally, Stanford relies on *Rocky Mountain Hospital*, 289 N.L.R.B. 1347 (1988), in which the Board adopted an ALJ decision upholding a complete ban on solicitation of nonemployees. According to Stanford, the Board's failure to explain why Stanford's policy differs from the one sustained in *Rocky Mountain Hospital* renders the decision here arbitrary and capricious. The Board responds that *Rocky Mountain Hos-*

*pital* has no precedential value because no one excepted to the ALJ's decision sustaining the solicitation ban. We agree with the Board.

As the Board has explained, it has a "well-established practice of . . . adopt[ing] an administrative law judge's findings to which no exceptions are filed. Findings adopted under such circumstances are not . . . considered precedent for any other case." *Colgate–Palmolive Co.*, 323 N.L.R.B. 515, 515 (1997). Nothing in *International Union of Operating Engineers, Local 12*, 270 N.L.R.B. 1172 (1984), is to the contrary. The issue in that case was whether an ALJ's finding of an NLRA violation, adopted by the Board without the union having filed an exception, could support an enhanced penalty for a later violation by the *same* union. In keeping with its position here, the Board concluded that "[w]hile the lack of formal review may diminish or even negate the precedential value of the rationale in such a decision, there is no sound basis for treating [it] as less than a formal determination of a respondent's culpability under the Act." *Id*. at 1172–73. Therefore, although it would have been preferable for the Board to say something about *Rocky Mountain Hospital*, its failure to do so renders its decision neither arbitrary nor capricious.

### *Eviction of Harland*

This brings us finally to Stanford's challenge to the Board's conclusion that the eviction of union organizer Harland violated NLRA section 8(a)(1). The facts are these: Sometime in September 1998, while Harland was sitting on a bench waiting for a ride from a hospital employee, a Stanford guard directed him to leave the premises. The guard recognized Harland both from earlier conversations and from having previously kicked him out of the cafeteria and other parts of the hospital for violating Stanford's solicitation and distribution policy. Although Harland insisted that he was merely waiting for a ride, like others standing nearby, the guard escorted him off the premises, telling him never to return.

The ALJ found that Harland's eviction constituted discrimination on the basis of protected activity because Stanford had

not evicted persons unaffiliated with the union who were also waiting for rides. Although the ALJ found that the eviction also violated California law, the Board, in affirming the ALJ, relied "solely on the judge's conclusion that the eviction discriminated against Harland based on protected activity." *UCSF Stanford Health Care*, 335 N.L.R.B. No. 42, at 1.

Stanford argues that the Board should have compared Harland to persons who were not only waiting for rides on hospital property, but who, like Harland, had also been previously asked to leave the hospital for violating its solicitation and distribution policy. According to Stanford, because neither the ALJ nor the Board found that it treated Harland any differently from others who had violated the solicitation and distribution policy, the eviction of Harland cannot constitute discrimination in violation of section 8(a)(1). We agree.

As a nonemployee union organizer—in contrast to a Stanford employee—Harland had no section 7 right of access to Stanford's property. *See Lechmere*, 502 U.S. at 532 (explaining that nonemployee union organizers are not directly protected by the NLRA). The rule that nonemployee organizers have no right of access to employers' property has two recognized exceptions. First, nonemployee union organizers are entitled to access where "the location of a plant and the living quarters of the employees places the employees beyond the reach of reasonable union efforts to communicate with them." *Id.* at 533–34 (internal quotation marks and citation omitted). Second, "an employer engages in discrimination as defined by section 8(a)(1) if it denies union access to its premises while allowing similar distribution or solicitation by nonemployee entities other than the union." *Lucile Salter Packard Children's Hosp.*, 97 F.3d at 587. As *Lucile Packard* demonstrates, however, this latter exception—the one at issue in this case—requires differential treatment of nonemployee organizers and similarly situated solicitors and distributors. Absent evidence of differential treatment of union and nonunion solicitors, there can be no finding of discrimination.

Here, the Board violated this basic principle. It compared Harland, a self-confessed serial violator of Stanford's solicita-

tion and distribution rules, to non-soliciting bench sitters. It should have compared Harland to other bench sitters who had previously violated Stanford's solicitation policy.

## III.

Having considered Stanford's remaining arguments and found them to be without merit, we deny the petition with respect to the solicitation and distribution policy and grant the Board's cross-application for enforcement. With respect to Harland's eviction, we grant Stanford's petition and deny the Board's cross-application for enforcement.

*So ordered.*