# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 7, 2006   Decided February 2, 2007

No. 05-1216

GUARDSMARK, LLC,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with
05-1236 and 05-1272

———

On Petitions for Review and Cross-Application for
Enforcement of an Order of the
National Labor Relations Board

———

*Edward R. Young* argued the cause and filed the briefs for petitioner Guardsmark, LLC.

*Maryann Parker* argued the cause for petitioner Service Employees International Union, Local 24/7. With her on the briefs were *Judith A. Scott* and *Craig Becker*. *Orrin Baird* entered an appearance.

*Ruth E. Burdick*, Attorney, National Labor Relations Board,

argued the cause for respondent. With her on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Julie B. Broido*, Senior Attorney.

*Edward R. Young* was on the brief for intervenor Guardsmark, LLC.

Before: HENDERSON, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Under National Labor Relations Board case law, where an employer promulgates work rules "likely to have a chilling effect on Section 7 rights, the Board may conclude that their maintenance is an unfair labor practice, even absent evidence of enforcement." *Lafayette Park Hotel*, 326 N.L.R.B. 824, 825 (1998), *enforced mem.*, No. 98-1625, 1999 WL 1215578, at \*1 (D.C. Cir. Nov. 26, 1999). Applying this principle, the Board found that two of petitioner's work rules—one requiring that employees register their complaints only through the chain of command and the other barring solicitation—violated the National Labor Relations Act. The Board found that a third rule—barring "fraternization"—was lawful because the Board thought employees would not reasonably interpret it to interfere with protected activities, a ruling the Union now challenges. Concluding that the Board faithfully applied its case law to the chain-of-command and solicitation rules, we deny the employer's petition for review. But because the Board's decision with respect to the fraternization rule was unreasonable, we grant the Union's petition.

**I.**

Petitioner Guardsmark, LLC, a nationwide company providing security guard services, distributes a handbook to all uniformed employees. Three of the handbook's rules are at issue here: a chain-of-command rule telling employees "not [to] register complaints with any representative of the client"; a solicitation rule prohibiting solicitation and distribution of literature "at all times while on duty or in uniform"; and a fraternization rule prohibiting employees from "fraterniz[ing] on duty or off duty" with other employees. *Guardsmark, LLC*, 344 N.L.R.B. No. 97, at *1 (June 7, 2005).

Focusing on events that occurred in Guardsmark's San Francisco office, the Service Employees International Union Local 24/7 filed unfair labor practice charges with the National Labor Relations Board, and the Board's General Counsel then issued a complaint, alleging that all three rules violate section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. §§ 151-169, which makes it an unfair labor practice for employers "to interfere with, restrain, or coerce employees in the exercise [of their section 7 rights]." *Id.* § 158(a)(1). Section 7, in turn, provides that employees:

> shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities . . . .

*Id.* § 157. The General Counsel charged that Guardsmark's rules discourage protected labor activity, such as enlisting the

support of customers for work grievances, soliciting and distributing literature while off duty, and meeting with other employees to discuss terms and conditions of employment. *Guardsmark*, 344 N.L.R.B. No. 97, at *14-15. Defending its three rules before the ALJ, Guardsmark argued that the chain-of-command rule applies only while employees are on duty; that the solicitation rule does not, as the company had informed some employees, apply to off-duty employees in uniform who cover up the company insignia; and that the fraternization rule targets only personal entanglements that "could cloud [a security guard's] judgment," thereby compromising the company's goal of providing reliable security to its clients. Admin. Hr'g Tr. 189, April 29, 2004.

The ALJ agreed with the General Counsel with respect to the chain-of-command rule because, according to the ALJ, the rule prevents employees from seeking client assistance regarding any aspect of their employment. *Guardsmark*, 344 N.L.R.B. No. 97, at *14. With respect to the other rules, the ALJ agreed with Guardsmark. The solicitation rule, the ALJ found, clearly communicates to employees that they may not engage in unofficial activity while in uniform, and thus, "it seems reasonable to presume that employees, without having to be specifically told, would understand that removing or covering their uniforms will constitute compliance with this provision." *Id.* Finding that employees would read the fraternization rule "in the context of [their] duties . . . to insure the protection of individuals and property," the ALJ concluded that they would understand both that the rule "is designed to provide safeguards so that security will not be compromised by interpersonal relationships," and that it does not preclude section 7 activity. *Id.* at *15. To remedy the chain-of-command violation, the ALJ recommended that Guardsmark be required to post a remedial notice in its San Francisco office. *Id.* at *16-17.

The Board adopted the ALJ's conclusion that the chain-of-command rule explicitly prohibits protected labor activity because nothing in the rule limits its application to working time. *Id.* at *2. But the Board disagreed with the ALJ regarding the solicitation rule, concluding that employees would not reasonably construe the rule to include a "safe harbor" for "removing or covering their uniforms [while soliciting off duty in order to] compl[y] with this provision." *Id.* at *4. The Board explained that Guardsmark's "clarification" of the rule to some employees in its San Francisco branch failed to cure the violation because the company never communicated the clarification to all employees. *Id.* at *5. The Board agreed with the ALJ that the fraternization rule prohibits only personal entanglements and that employees would reasonably understand it not to apply to protected activity. *Id.* at *3. Board Member Liebman dissented from the fraternization ruling, arguing that the limitation to personal entanglements, while perhaps the best reading of the rule, was not the only reasonable interpretation. *Id.* at *8. Finally, the Board modified the ALJ's order to require nationwide posting of remedial notices. *Id.* at *6.

Guardsmark petitions for review as to the chain-of-command and solicitation rules. The Union petitions as to the fraternization rule, and Guardsmark intervenes in opposition. The Board seeks enforcement of its entire order.

**II.**

To determine whether a work rule violates NLRA section 8(a)(1), the Board considers "'whether the rule[] would reasonably tend to chill employees in the exercise' of their statutory rights." *Adtranz ADB Daimler-Benz Transp. v. NLRB*, 253 F.3d 19, 25 (D.C. Cir. 2001) (quoting *Lafayette Park Hotel*, 326 N.L.R.B. 824, 825 (1998)). In making this assessment, the Board engages in a two-step inquiry described in *Martin Luther*

*Memorial Home*, 343 N.L.R.B. No. 75, at \*1-2 (May 19, 2004). First, the Board examines whether the rule "*explicitly* restricts" section 7 activity, *id.* at \*1; if it does, the rule violates the Act. *id.* But if nothing in the rule explicitly restricts section 7 activity, then the Board moves to the inquiry's second step, under which the rule violates the Act if it satisfies any one of the following three conditions: "(1) employees would reasonably construe the language to prohibit Section 7 activity; (2) the rule was promulgated in response to union activity; or (3) the rule has been applied to restrict the exercise of Section 7 rights." *Id.* at \*2. In the first step—which looks to see whether the rule explicitly restricts section 7 activity—as well as in the first of the second step's three alternative conditions—which looks to see whether employees would reasonably construe the rule to restrict section 7 activity—the Board focuses on the text of the challenged rule. *See id.* at \*2-3. Thus, "mere maintenance" of a rule likely to chill section 7 activity, whether explicitly or through reasonable interpretation, can amount to an unfair labor practice "even absent evidence of enforcement." *Lafayette Park Hotel*, 326 N.L.R.B. 824, 825 (1998), *enforced mem.*, No. 98-1625, 1999 WL 1215578, at \*1 (D.C. Cir. Nov. 26, 1999); *see also Cmty. Hosps. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1088 (D.C. Cir. 2003) (citing the Board's "mere maintenance" rule).

Because Congress delegated the task of applying the NLRA to particular situations to the NLRB, Board determinations "are entitled to considerable deference so long as they are 'reasonably defensible.'" *Adtranz*, 253 F.3d at 25 (quoting *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979)). We defer to the Board's interpretation of NLRA section 8(a)(1) when the Board "faithfully applies [the "reasonably tend to chill"] standard, and adequately explains the basis for its conclusion." *Id.* Should the Board adopt "an unreasonable or otherwise indefensible interpretation of Section 8(a)(1)'s prohibition," however, we will deny enforcement. *Id.*

With these standards in mind, we turn to the three rules at issue in this case.

### Chain-of-Command Rule

> While on duty you must follow the chain of command and report only to your immediate supervisor.  If you are not satisfied with your supervisor's response, you may request a meeting with your supervisor and his or her supervisor.  If you become dissatisfied with any other aspect of your employment, you may write the Manager in Charge or any member of management.  Written complaints will be acknowledged by letter.  All complaints will receive prompt attention.  *Do not register complaints with any representative of the client.*

*Guardsmark*, 344 N.L.R.B. No. 97, at *1 (emphasis added).  The Board found that the rule's last sentence "explicitly trenches upon the right of employees under Section 7 to enlist the support of an employer's clients or customers regarding complaints about terms and conditions of employment." *Id.* at *2. *See also Stanford Hosp. & Clinics v. NLRB*, 325 F.3d 334, 343 (D.C. Cir. 2003) (noting that employees' statutorily protected rights to solicitation extend to solicitation of nonemployees).  The Board rejected Guardsmark's contention that the last sentence is limited by the "[w]hile on duty" phrase appearing in the rule's first sentence, explaining that even though the phrase "arguably limits [the rule]'s prohibition on lodging complaints with employees outside the chain of command to working time only[,] . . . . its prohibition on discussing terms of employment with customers is not similarly time-limited.  It is absolute . . . ." *Guardsmark*, 344 N.L.R.B. No. 97 at *2.

Guardsmark argues that instead of reading the rule as a whole, as *Martin Luther* requires, 343 N.L.R.B. No. 75, at *1 (holding that the Board "must refrain from reading particular phrases in isolation . . ."), the Board "treated the phrase 'while on duty' in complete isolation from the phrases that immediately followed it in the same paragraph." Guardsmark's Opening Br. 9-10. In our view, however, the rule's structure supports the Board's reading. Following the first sentence, which tells employees: "While on duty you must follow the chain of command and report only to your immediate supervisor," the next four sentences describe the chain of command, and the last sentence flatly tells employees: "Do not register complaints with any representative of the client." Given the change in focus from supervisors to clients, the number of intervening sentences, and the last sentence's direct command forbidding complaints to clients, the Board reasonably read "while on duty" to apply exclusively to the prohibition against discussing complaints with non-supervisory employees and interpreted the ban on client communications to be a separate non-time-limited instruction. Because "[e]mployees have a statutorily protected right to solicit sympathy, if not support, from the general public . . . [and] customers" regarding their terms and conditions of employment, *see Stanford Hosp.*, 325 F.3d at 343 (quoting *NCR Corp.*, 313 N.L.R.B. 574, 576 (1993)), the Board's conclusion that the chain-of-command rule explicitly prohibits section 7 activity is "reasonably defensible." *Adtranz*, 253 F.3d at 25. *Cf. Cent. Hardware Co. v. NLRB*, 407 U.S. 539, 542-43 (1972) ("Early in the history of the . . . Act the Board recognized the importance of freedom of communication to the free exercise of organization rights.").

Next, Guardsmark argues that "the Board ignored [the fact] that there was nothing in the record to show that [Guardsmark] ever maintained the rule in a manner suggesting that employees were prohibited from voicing complaints to clients during their

non-working time." Guardsmark's Opening Br. 10. Under the two-step inquiry, however, the Board had no need to reach this issue given that it had already decided that the rule explicitly restricts section 7 activity. Put differently, since "mere maintenance" of a rule likely to chill section 7 activity may constitute an unfair labor practice "even absent evidence of enforcement," *Lafayette Park*, 326 N.L.R.B. at 825, the Board, having concluded that the rule explicitly restricts section 7 activity, had no obligation to consider whether Guardsmark actually enforced the rule against such activity.

Guardsmark cites three cases, *Aroostook County Regional Ophthalmology Center v. NLRB*, 81 F.3d 209 (D.C. Cir. 1996), *Adtranz ADB Daimler-Benz Transportation v. NLRB*, 253 F.3d 19 (D.C. Cir. 2001), and *U-Haul Co.*, 347 N.L.R.B. No. 34 (June 8, 2006), for the proposition that the Board should have taken account of the fact that the company never applied the chain-of-command rule to protected section 7 activities. Although Guardsmark is correct that these cases discuss lack of enforcement, they do so only after first concluding that the challenged rules were not likely to chill section 7 activity and that their mere maintenance was thus not an unfair labor practice. *See Lafayette Park*, 326 N.L.R.B. at 825. In *Aroostook*, the challenged rule prohibited employees from discussing grievances within hearing distance of patients. Because nothing in the rule explicitly prohibited *all* discussion of grievances or could be interpreted to do so except through "fanciful" speculation, we held that the rule did not chill protected activity. 81 F.3d at 213. Consistent with the Board's two-step inquiry, only then did we note the absence of enforcement against protected activity. *Id.* at 213-14. Similarly, in *Adtranz*, which involved a rule expressly prohibiting "soliciting and distribution without authorization," 253 F.3d at 28, although we did consider the challenged rule's context, including the absence of enforcement, the rule's legitimate

business purpose, and the lack of anti-union animus, we did so only after first concluding that the rule, which applied only to conduct during working time, did not prohibit section 7 activity. *Id.* at 28-29. To be sure, we said that "the NLRB may not cavalierly declare policies to be facially invalid without any supporting evidence," *id.* at 29, but that statement must be viewed in light of the fact that in *Adtranz* the Board "cavalierly" invalidated a solicitation rule that applied only "during working time," *id.* at 28, and was thus facially valid. Since *Adtranz*, moreover, we have upheld Board rulings that faithfully apply the two-step inquiry. *See, e.g.*, *Cmty. Hosps.*, 335 F.3d at 1088. In the third cited case, *U-Haul*, the Board upheld an employer statement advising—but not requiring—employees unable to resolve problems with supervisors to "see" the president. 347 N.L.R.B. No. 34, at *6. While the Board, like this court in *Aroostook* and *Adtranz*, mentioned the absence of evidence of enforcement, it did so only after finding nothing in the challenged statement that explicitly or through reasonable interpretation prevented employees from complaining to customers or non-supervisory employees. *Id.* at *6-7. Here, by contrast, the Board found that the chain-of-command rule's mandatory language explicitly prohibits solicitation of clients. *Guardsmark*, 344 N.L.R.B. No. 97, at *2. Under the two-step inquiry, then, the Board had no reason to consider the absence of enforcement.

Finally, Guardsmark argues that the Board erred by failing to consider the chain-of-command rule's purpose, namely "to establish a method for efficiently reporting problems and having problems resolved [in order to] maintain an orderly work progression and resolve problems in a prompt manner." Guardsmark's Opening Br. 15. Although efficient resolution of disputes may well represent a valid business purpose, Guardsmark never argued, neither here nor before the Board, that this purpose represents a special circumstance necessary to

employee discipline or company production. *Cf. Stanford Hosp.*, 325 F.3d at 338 (citing *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 492-93 (1978)) (holding that, in the context of solicitation rules, such circumstances are required to justify restrictions on solicitation during nonworking time). Nor did the company argue, as it must to prevail, that it narrowly tailored the chain-of-command rule to achieve its goal without interfering with section 7 activity. *Guardsmark*, 344 N.L.R.B. No. 97, at *2 n.3. *See also Cmty. Hosps.*, 335 F.3d at 1088 (upholding a rule narrowly tailored to achieve the employer's purpose without chilling protected activity).

*Solicitation Rule*

> Solicitation and distribution of literature not pertaining to officially assigned duties is prohibited *at all times while on duty or in uniform*, and any known or suspected violation of this order is to be reported to your immediate supervisor immediately.

*Guardsmark*, 344 N.L.R.B. No. 97, at *1 (emphasis added). Finding that this rule violates section 8(a)(1), the Board explained that the rule "undoubtedly places restrictions on protected off-work solicitation [and] absent some persuasive justification for the rule, should be deemed overbroad and unlawful." *Id.* at *4. The Board rejected Guardsmark's argument that employees, knowing that the rule's purpose was to ensure that their unofficial activities will not be attributed to the company, would understand they could solicit in uniform while off duty so long as they covered up company insignia. *Id.* "[N]othing in the plain language of the rule," the Board explained, "communicates to employees that the rule allows such a safe harbor." *Id.* Although Guardsmark explained the safe harbor to some employees, the Board found the company's

explanation "plainly insufficient to avoid a violation of the Act [because] narrowing interpretations of overly broad rules must be communicated to the entire work force covered by the rule." *Id.* at \*5.

Guardsmark argues that nothing in the rule explicitly prohibits off-duty solicitation and that employees would not reasonably so construe it, especially after the company clarified the rule's safe harbor. We disagree. To begin with, because Guardsmark failed to communicate the safe harbor clarification to all employees who had received the handbook, the Board properly focused on the rule's language. *See Ichikoh Mfg., Inc.*, 312 N.L.R.B. 1022, 1022 (1993) (holding that an employer must show that it "clearly communicated to all the . . . employees to whom the presumptively invalid rule was disseminated that the rule did not mean what it said"). And because that language prohibits solicitation and distribution "*at all times* while on duty *or* in uniform," the Board correctly read it disjunctively: the rule bars solicitation and distribution at all times when employees are on duty whether in or out of uniform and at all times while employees are in uniform whether on or off duty. Although Guardsmark's rule is not as expansive as some other solicitation rules the Board has found unlawful, *see, e.g.*, *Martin Luther*, 343 NLRB No. 75, at \*15-16 (invalidating solicitation rule that applies "whether [employees] are on duty or off duty"), because the company's rule prohibits off-duty solicitation by uniformed employees, and because the Board presumes that "a rule prohibiting employee solicitation, which is not by its terms limited to working time, would [explicitly] violate [section] 8(a)(1)," *id.* at \*1 n.5, the Board's conclusion that the rule violates the Act is "reasonably defensible." *Adtranz*, 253 F.3d at 25.

Echoing arguments made in defense of the chain-of-command rule, Guardsmark contends that the Board failed to

consider (1) the absence of evidence that it applied the rule to section 7 activity and (2) that it had a legitimate reason for adopting the rule, namely to disassociate itself from its employees' unofficial activities. As to the first point, under the two-step inquiry, having concluded that employees would reasonably read the rule to prohibit off-duty solicitation while in uniform, the Board had no need to consider the absence of enforcement. *Supra* p. 9. And although we have no doubt that disassociating itself from its employees' unofficial activities represents a legitimate business objective, absent a "special circumstance[] . . . mak[ing] the rule necessary to maintain production or discipline," *Stanford Hosp.*, 325 F.3d at 338, Guardsmark may not accomplish that goal through a rule that restricts its employees' right to engage in union solicitation while off duty.

### *Fraternization Rule*

> While on duty you must NOT . . . *fraternize on duty or off duty*, date or become overly friendly with the client's employees or with co-employees.

*Guardsmark*, 344 N.L.R.B. No. 97, at *1 (emphasis added). The Board found that, unlike the chain-of-command and solicitation rules, nothing in the fraternization rule ran afoul of the Act. Observing that the rule lists "fraternize" next to two terms referring to romantic relationships among employees—"date" and "become overly friendly"—the Board concluded that "employees would reasonably understand the rule to prohibit only personal entanglements rather than activity protected by the Act." *Id.* at *3. The Board analogized Guardsmark's rule to one upheld in *Lafayette Park* that barred employee fraternization with hotel guests on hotel property. *See* 326 N.L.R.B. at 825. Acknowledging that the rules in the two cases "[are] not

identical," the Board nonetheless found that "any differences between the rules are not material and do not warrant a different outcome here." *Guardsmark*, 344 N.L.R.B. No. 97, at *3. The Board also observed that Guardsmark's goal—"to provide safeguards so that security will not be compromised by interpersonal relationships"—was even stronger than the justification offered by the employer in *Lafayette Park*, which was only "to prevent the appearance of favoritism, claims of sexual harassment, and employee dissension created by romantic relationships in the workplace." *Id.* (quoting *Lafayette Park*, 326 N.L.R.B. at 827 n.14).

We see several defects in the Board's reasoning. To begin with, although the Board draws the meaning of "fraternize" from its neighboring words—in the statutory context we would call this *noscitur a sociis*—there is an equally applicable canon of construction, namely that all words in a text must be given independent meaning. *Cf. United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ("The cardinal principle of statutory construction is to save and not to destroy. It is our duty to give effect, if possible, to every clause and word of a statute." (internal quotation marks and citations omitted)); *Davis v. Chevy Chase Financial, Ltd.*, 667 F.2d 160, 170 (D.C. Cir. 1981) (applying the contract law credo that "every word in an agreement should be given meaning"). As the Union points out, accurately in our view, if the word "fraternize" means nothing more than the personal relationships conjured up by "dating" and "becoming overly friendly," then "fraternize" would have no independent meaning. Dissenting Board Member Liebman put it this way:

> Here, a reasonable employee certainly could understand [Guardsmark]'s rule to sweep much more broadly than prohibiting only personal entanglements with clients and coworkers. The

> rule already bars dating and becoming overly friendly with those individuals, so a reasonable employee might well conclude that the prohibition on fraternizing must apply to something else.

*Guardsmark*, 344 N.L.R.B. No. 97, at \*8 (quotation marks omitted).

The question, then, is whether employees would reasonably interpret that "something else" to bar them from discussing terms and conditions of employment. Answering yes, the Union cites *Merriam-Webster's Collegiate Dictionary*, which defines "fraternize" as "to associate or mingle as brothers or on fraternal terms," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 463 (10th ed. 1996), as well as *Roget's New Millennium Thesaurus*, which lists "associate," "cooperate," "join," and "unite" as synonyms of "fraternize," (1st ed. v.1.3.1 2006), http://thesaurus.reference.com/browse/fraternize. According to the Union, because "fraternize" includes fraternal relationships and because unions are fraternal organizations, *see Mallory Battery Co.*, 239 N.L.R.B. 204, 205 (1978), employees would reasonably interpret "fraternize" to include discussion of terms and conditions of employment. Although dictionaries also define "fraternize" to include engagement in social and intimate relationships, *see, e.g.*, CAMBRIDGE ADVANCED LEARNER'S DICTIONARY 503 (2d ed. 2005) ("to meet someone socially, especially someone who belongs to an opposing army or team, or has a different social position"); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 463 ("to be friendly or amiable"); WEBSTER'S NEW WORLD DICTIONARY 555 (2d College ed. 1986) ("to have intimate or friendly relations with any of the enemy"), every major dictionary we have reviewed, including one cited by the Board, defines the term to include participation in fraternal relationships. *See, e.g.*, 6 OXFORD ENGLISH

DICTIONARY 151-52 (2d ed. 1989) ("to associate or sympathize with as a brother or as brothers"); WEBSTER'S NEW WORLD DICTIONARY 555 ("to associate in a brotherly manner; be on friendly terms"); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 463; WEBSTER'S THIRD INTERNATIONAL DICTIONARY 903-04 (1993) ("to associate or mingle as brothers or on fraternal terms: engage in comradely social discourse"); AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 699 (4th ed. 2000) ("to associate with others in a brotherly or congenial way"). Moreover, every one of these dictionaries lists fraternal association as the primary definition; social and intimate associations are secondary. *See id.* And although one of the dictionaries upon which the Board relies, the *Compact Oxford English Dictionary*, defines "fraternize" only in terms of personal relationships, COMPACT OXFORD ENGLISH DICTIONARY 399 (3d ed. 2005), the full *Oxford English Dictionary* lists "to associate or sympathize with as a brother or as brothers" as its primary definition, 6 OXFORD ENGLISH DICTIONARY 151-52. Given this primary definition, and given that dictionaries serve as "guide[s] to the . . . meaning of words," John Simpson, *Preface* to OXFORD ENGLISH DICTIONARY (3d ed. 2000), http://oed.com/about/oed3-preface/distractions.html, we agree with dissenting Board Member Liebman that employees would reasonably interpret the rule to prevent them from discussing terms and conditions of employment. In other words, we find unreasonable the Board's conclusion that employees would understand the rule to prohibit "only personal entanglements rather than activity protected by the Act." *Guardsmark*, 344 N.L.R.B. No. 97, at *3.

We also disagree with the Board that the differences between this case and *Lafayette Park*, 326 N.L.R.B. at 827, in which the Board sustained a rule prohibiting fraternization between hotel guests and employees on hotel property, "are not material and do not warrant a different outcome here."

*Guardsmark*, 344 N.L.R.B. No. 97, at *3. As the Board itself recognized, Guardsmark's rule sweeps far more broadly than *Lafayette Park*'s, prohibiting fraternization among employees at all times and without regard to the location of the interaction. *Id.* Moreover, because section 7 guarantees employees' right to associate fraternally for the purpose of discussing terms and conditions of employment, the Board's conclusion in *Lafayette Park* that the hotel's fraternization policy did not interfere with protected activity must have rested on the proposition that "fraternize" meant something different in the context of that case. Because "fraternize" denotes either participation in fraternal relationships or engagement in intimate or friendly relationships with members of an "opposing [group]" or those with a different "social position," s*upra* p.15, and because hotel employees and guests occupy different "social positions," the Board must have reasoned in *Lafayette Park* that employees would understand the rule barring fraternization with guests to mean "fraternize" in the latter sense. Understood this way, the rule would allow employees to make protected section 7 appeals to hotel guests without "fraternizing." By contrast, Guardsmark's rule, which bars employees from fraternizing *with each other*, does not suggest fraternizing between members of different social groups. Unlike the employees in *Lafayette Park*, then, Guardsmark employees would reasonably believe that the company's rule prohibits fraternal discussion of terms and conditions of employment. Indeed, in this sense of "fraternize," employees could hardly engage in protected activity *without* fraternizing with each other.

Finally, we agree with the Union that the Board relied too heavily on Guardsmark's business justification. According to the Board, Guardsmark's rule "is designed to provide safeguards so that security will not be compromised by interpersonal relationships . . . between . . . guards . . . ." *Guardsmark*, 344 N.L.R.B. No. 97, at *3 (internal quotation marks omitted).

Guardsmark adds that it must prohibit personal entanglements among guards at all times because "it's difficult to draw a solid line between being friends off duty and on [and] if employees develop a social relationship with somebody, . . . it is very likely to carry over to have that same level of relationship when they are on the job." Intervenor's Br. 8. But even if Guardsmark has a legitimate interest in a twenty-four-hour ban, it had an obligation to demonstrate its inability to achieve that goal with a more narrowly tailored rule that would not interfere with protected activity. *See, e.g.*, *Cmty. Hosps.*, 335 F.3d at 1088. For example, since dating and becoming overly friendly include personal entanglements, Guardsmark could have removed the word "fraternize" from the rule altogether. Alternatively, it could have either defined the term to encompass romantic relationships only or made an exception for protected activity. Either way, Guardsmark could have achieved its legitimate goal without interfering with section 7 activity. Because it failed to do so, we cannot enforce the Board's order. *See id.*

**III.**

This brings us to Guardsmark's claim that the Board's remedy is too broad. Although the ALJ recommended that the company post remedial notices at its San Francisco offices, the Board ordered it to do so at all offices nationwide. Because the Board has "broad discretionary power . . . to fashion remedies" for unfair labor practices, we will alter its remedial decisions only if "it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Petrochem Insulation, Inc. v. NLRB*, 240 F.3d 26, 34-35 (D.C. Cir. 2001) (quoting *Virginia Elec. & Power Co. v. NLRB*, 319 U.S. 533, 540 (1943)).

Guardsmark has failed to make such a showing. Where, as here, a company-wide policy violates the NLRA—Guardsmark

distributed its handbook with the three unlawful rules to all employees nationwide—only a company-wide remedy extending as far as the company-wide violation can remedy the damage. *See, e.g.*, *U.S. Postal Serv. v. NLRB*, 969 F.2d 1064, 1072 (D.C. Cir. 1992) (enforcing NLRB's grant of nationwide relief where the employer's provisions constituting an unfair labor practice applied nationwide). Nationwide remedial notice thus "effectuate[s] the policies of the [NLRA]." *See Petrochem Insulation*, 240 F.3d at 34.

## IV.

For the reasons given above, we deny Guardsmark's petition for review and grant the Board's cross-petition for enforcement with respect to the chain-of-command and solicitation rules, as well as the scope of the remedy. We grant the Union's petition for review as to the fraternization rule and, as to that rule, deny the Board's cross-petition for enforcement.

*So ordered.*