**BROCKTON HOSPITAL,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent.

**Massachusetts Nurses Association,** Intervenor.

No. 01–1219.

United States Court of Appeals, District of Columbia Circuit.

Argued March 11, 2002.

Decided June 28, 2002.

Arthur P. Murphy argued the cause for petitioner. With him on the briefs were Gregory J. Walsh and Robert H. Morsilli.

James M. Oleske, Jr., Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and David S. Habenstreit, Supervisory Attorney. Anne M. Lofaso, Attorney, entered an appearance.

Jack J. Canzoneri was on the brief for intervenor.

Before: GINSBURG, Chief Judge, and ROGERS and GARLAND, Circuit Judges.

Opinion for the Court filed by Chief Judge GINSBURG.

GINSBURG, Chief Judge:

Brockton Hospital petitions for review of a Decision and Order of the National Labor Relations Board holding that the Hospital violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by preventing the Massachusetts Nurses Association (the Union) from distributing literature to its members at entrances to the Hospital, maintaining overbroad solicitation, distribution and confidentiality policies, and removing from the door of a nurse's locker a notice announcing a union meeting. The Board has cross-applied for enforcement of its order and the Union has intervened in support of the Board. We deny the petition and grant the cross-application for enforcement except with respect to the alleged but uncharged unfair labor practice stemming from the removal of the meeting notice.

## I. Background

The Union has represented the registered nurses at Brockton Hospital, an acute care facility, for over 20 years. In anticipation of the October, 1997 expiration of the Union's collective bargaining agreement with the Hospital, the Union began early in that year what it called a "safe care campaign," part of which involved the

distribution of literature to nurses in the bargaining unit. The literature, as described by the Board, consisted largely of articles addressing "the adverse effect on patients caused by downsizing and restructuring of nursing staff and the use of nonprofessional employees giving the care and treatment that used to be the sole province of nurses." *Brockton Hosp. and Mass. Nurses Ass'n*, 333 N.L.R.B. No. 165 at 7, 2001 WL 521996 (2001). The Hospital reasonably characterizes the literature as containing "shocking and sensational headlines" and focusing upon "horror stories of patient death and injury due to allegedly unsafe care" at hospitals other than Brockton.

For ten consecutive Thursdays beginning March 20, 1997 off-duty nurses distributed this literature to other nurses in the vestibule at the front entrance to the Hospital, at the rear entrance, and at the Emergency/Outpatient entrance. The Hospital stopped distribution in the vestibule on the first two occasions but thereafter allowed it while making clear its view that it could lawfully prohibit the practice. In August, 1997 a Hospital supervisor removed from a nurse's locker a notice of a union meeting, which notice had been posted without prior permission.

The Union timely filed unfair labor practice charges concerning the Hospital's interference with the distribution of literature, as well as its policies limiting solicitation and distribution and delineating the nurses' obligations with regard to confidentiality. The General Counsel thereafter issued a complaint alleging that the Hospital's (1) ban on distribution in the vestibule; (2) solicitation and distribution policies; (3) confidentiality policy; and (4) removal of the union notice each violated § 8(a)(1) of the Act. The ALJ so held, *Brockton Hosp.*, 333 N.L.R.B. No. 165 at 10–12, and the Board agreed, adopting as

its own much of the ALJ's reasoning, *id.* at 1–3.

## II. Analysis

■ The court reviews the Board's decision deferentially. We uphold its findings of fact if they are supported by substantial evidence, *see United States Testing Co. v. NLRB*, 160 F.3d 14, 19 (D.C.Cir.1998), and abide its interpretation of the Act if it is reasonable and consistent with controlling precedent, *see Local 702, Int'l Bhd. of Elec. Workers v. NLRB*, 215 F.3d 11, 15 (D.C.Cir.2000).

The Hospital challenges all the Board's determinations that it violated § 8(a)(1). That provision makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of" their § 7 rights, among others, to "assist labor organizations ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection," 29 U.S.C. § 157. Section 7 "necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite." *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 491, 98 S.Ct. 2463, 2469, 57 L.Ed.2d 370 (1978).

### A. The prohibition of distribution

■ A hospital is presumptively allowed to prohibit the distribution of literature in any work area and to ban solicitation more narrowly in "immediate patient-care areas." *NLRB v. Baptist Hosp., Inc.*, 442 U.S. 773, 778–79, 99 S.Ct. 2598, 2601–02, 61 L.Ed.2d 251 (1979). Outside work areas a hospital may ban solicitation and distribution only as "necessary to avoid disruption of health-care operations or disturbance of patients." *Id.* at 779, 99 S.Ct. at 2602. In this case the Board determined that the Hospital unlawfully prohibited employees from distributing union lit-

erature in the vestibule and at the other entrances because those areas are not work or immediate patient care areas and the Hospital had not demonstrated that the prohibition was necessary to avoid disruption or disturbance. *See Brockton Hosp.*, 333 N.L.R.B. No. 165 at 7–10. The Hospital attacks these conclusions on several grounds, none of which we find persuasive.

■ The Hospital's primary contention is that prohibiting distribution in the vestibule was necessary to avoid disturbing patients. The Hospital first argues that the ALJ, whose opinion the Board adopted on this point, failed altogether to address this issue. Not quite. The ALJ's decision could have been more precise, but we agree with the Board that it is clear enough the ALJ was of the opinion the Hospital had not shown a likelihood of patients being disturbed: The ALJ acknowledged that the Hospital's expert witnesses had "credibly testified that if patients or their families saw these articles they could become upset and anxious," but went on to find "there was not a shred of evidence that any patient or family member saw any of this literature," the Hospital "received no complaints about the literature," and "[t]here was no evidence that any patient was ever disturbed or inconvenienced by the distribution of this literature." *Id.* at 7–8.

Turning to the merits, the Hospital argues that it presented evidence the prohibition was necessary, to wit, the disturbing nature of the literature; the testimony of three doctors that if patients saw the literature they could experience stress and become distrustful; the number of patients that use the vestibule to enter and exit the Hospital; and the testimony that literature (which may have been distributed in the vestibule) was left in various parts of the Hospital. The Hospital's position is that it

was not required to show actual disruption or disturbance, but only that the distribution "may adversely affect patients," quoting *Baptist Hosp.*, 442 U.S. at 781, 99 S.Ct. at 2603. Finally, the Hospital asserts the Board failed to consider "the availability of alternative means of communication," as required by *Baylor Univ. Med. Ctr. v. NLRB*, 662 F.2d 56, 63 (D.C.Cir.1981). The Board and the Union argue that the Board reasonably concluded the Hospital failed to show a likelihood of disturbance.

The Board and the Union concede, and we agree, that the Hospital had to show only a likelihood of, not actual, disruption or disturbance, *see Baptist Hosp.*, 442 U.S. at 781 n. 11, 99 S.Ct. at 2603; but substantial evidence supports the Board's decision that the Hospital did not meet even this standard. The Hospital's experts testified that if patients saw or heard about the content of the literature they would be upset, *Brockton Hosp.*, 333 N.L.R.B. No. 165 at 7–8; the Hospital presented no reason, however, to believe patients were likely to learn of the content of the literature. As the Board points out, when the Hospital stopped the nurses from distributing the literature in the vestibule, the nurses made clear that they intended to distribute it only to members of the Union — a practice approved by the Supreme Court in *Beth Israel*, 437 U.S. at 503 n. 23, 98 S.Ct. at 2475 n. 23 — and so they did. As the Board further notes, the Hospital produced no evidence that any patient or patient's family ever saw the literature, and there is no evidence of any complaint by a patient or a patient's relative. In *Beth Israel* the Court found the same lack of evidence regarding patients being disturbed "[e]specially telling." *Id.* at 502, 98 S.Ct. at 2474. Furthermore, the Board reasonably discounted the significance of the Hospital's evidence that some literature was found in the lobby and near the

cafeteria because "the lobby was frequently policed by the cleaning staff and there was no evidence any patient or family or visitors ever picked up and read or even saw the literature." *Brockton Hosp.*, 333 N.L.R.B. No. 165 at 8.

█ We also agree with the Board that the Hospital's reliance upon *Baptist Hosp.*, 442 U.S. at 782–86, 99 S.Ct. at 2603–06 (upholding solicitation ban in corridors and sitting rooms) and *Baylor*, 662 F.2d at 65 (indicating that prohibition of solicitation in cafeteria during specified times may be lawful), is misplaced. In both cases, as the Board points out, the hospital presented evidence that the prohibited activity was likely to disturb patients or to disrupt operations. *Baptist Hosp.*, 442 U.S. at 784, 99 S.Ct. at 2604–05; *Baylor*, 662 F.2d at 60 n. 5, 62. Finally, although the availability of alternative means of communicating with employees is an important consideration in some cases, *see Beth Israel*, 437 U.S. at 505, 98 S.Ct. at 2475–76; *Baylor*, 662 F.2d at 63–64, we agree with the Board that "the possible availability of alternative areas for distribution of union literature is of marginal importance when," as in this case, "the employer has not demonstrated an impact on patient care." *See NLRB v. Southern Md. Hosp. Ctr.*, 916 F.2d 932, 936 (4th Cir.1990).

█ The Hospital also challenges the Board's conclusion that the vestibule is not a work area. The Hospital points out that employees assist discharged patients through the vestibule, janitors clean the area, and a guard is sometimes stationed there. Here the Hospital relies upon *Pikeville United Methodist Hosp. of Ky. v. NLRB*, 109 F.3d 1146 (6th Cir.1997), where the court referred to a patient drop-off area as a work area. In the alternative the Hospital argues that the vestibule should be considered part of the lobby, which it contends is also a work area.

The Board in its order correctly relied upon two of its prior cases for the proposition that cleaning, guarding, and escorting patients do not a work area make. *Brockton Hosp.*, 333 N.L.R.B. No. 165 at 9 (citing *United States Steel Corp.*, 223 N.L.R.B. 1246, 1976 WL 6939 (1976), and *Medical Ctr. Hosp.*, 244 N.L.R.B. 742, 1979 WL 9858 (1979)). As for the reference in *Pikeville* to the contrary, it is unsupported by any analysis — not surprising, for the matter seems not to have been disputed, 109 F.3d at 1158 — and the same circuit has since held that an area in which minimal work occurs is not a work area, *see United Parcel Service, Inc. v. NLRB*, 228 F.3d 772, 775–77 (6th Cir.2000) (check-in area where instructions were sometimes given to drivers was not a work area); *accord Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 472–73 (5th Cir.2001) (upholding ALJ's determination that entranceway with desk at which foreman occasionally sat was not work area). Finally, the Board's decision to treat the vestibule — "a self-contained area between the lobby and the outside entry," *Brockton Hosp.*, 333 N.L.R.B. No. 165 at 8 — as a room distinct from the lobby was reasonable. The areas were, after all, separated by glass doors.

█ The Hospital next contends there is not substantial evidence that it prohibited the Union from distributing literature at the rear and Emergency/Outpatient entrances. The Hospital concedes that it failed to raise this issue before the Board, *see* 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board ... shall be considered by the court"), but asks the court to consider the argument because the ALJ did not make clear that he found the Hospital had prohibited distribution at those entrances and therefore the Hospital did not argue to the Board that it had not prevented distribution

there. Although the ALJ's decision is indeed ambiguous, the Board's decision is not, *see Brockton Hosp.*, 333 N.L.R.B. No. 165 at 1 n. 5; yet the Hospital did not seek reconsideration by the Board. Consequently, the Hospital's argument is not properly before the court. *See Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982).

■ Next, the Hospital argues that the literature distributed by the nurses disparaged the Hospital's services and its distribution was therefore unprotected pursuant to *NLRB v. Local Union No. 1229, Int'l Bhd. of Elec. Workers*, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953) *(Jefferson Standard)*. For two reasons, we cannot agree. First, as the Board pointed out in its order, "it is agreed by all the parties to this litigation that the articles did not refer to Brockton Hospital as being the hospital where any of the mishaps in the articles happened." *Brockton Hosp.*, 333 N.L.R.B. No. 165 at 7. In other words, Brockton's services were not expressly disparaged. Second, insofar as the implication was that the same problems could occur at Brockton if it downsized its nursing staff, that inference could be drawn only by the Hospital's nurses, not by the public, because the distribution was limited to the nurses. In these circumstances the concern underlying *Jefferson Standard*, that activity "reasonably calculated to harm the company's reputation and reduce its income" rather than further collective bargaining be excluded from the protection of the Act, 346 U.S. at 471, 74 S.Ct. at 176, simply is not present.

■ Finally, the Hospital contends that the Board has ignored its "heavy continuing responsibility to review its policies concerning organizational activities in various parts of hospitals," *Beth Israel*, 437 U.S. at 508, 98 S.Ct. at 2477. According to the

Hospital, that review should have led the Board to decide that a hospital may presumptively ban solicitation and distribution in any area "to which patients, their families and visitors have regular access."

The Board clearly did appreciate its continuing duty to keep current its approach to distribution and solicitation in hospitals; it simply found "no support in the record for departing from ... well-settled principles." *Brockton Hosp.*, 333 N.L.R.B. No. 165 at 2. Indeed, the Hospital does not even purport to have provided evidence that solicitation and distribution in all areas to which patients, their families, and visitors have access is disruptive or disturbing. Hence, the Board was not obligated to change its presumptions, and the Hospital's only defense of its policies limiting solicitation and distribution must fail.

B. Confidentiality Policy

■ The Board held that the Hospital's confidentiality policy was overbroad and therefore unlawful. That policy states: "Information concerning patients, associates [that is, nurses], or hospital operations should not be discussed either inside or outside the hospital, except strictly in connection with hospital business." *Brockton Hosp.*, 333 N.L.R.B. No. 165 at 10. The Board held the policy overbroad because "it would have a tendency to cause nurses who read it to believe it restricted his or her [sic] right to discuss hours, wages, and other terms and conditions of employment." *Id.*

According to the Hospital, the policy "merely protects the confidentiality of patient information," making the Board's decision contrary to this court's teaching in *Aroostook County Reg'l Ophthalmology Ctr. v. NLRB*, 81 F.3d 209, 213 (1996), and the Board's prior decision in *Lafayette Park Hotel*, 326 N.L.R.B. 824, 1998 WL 574958 (1998). Not at all. The policy on

its face prohibits nurses from discussing with each other, let alone Union officials, "information concerning [themselves]," which the Board argues the nurses could reasonably read to include their wages, hours, and working conditions — the very stuff of collective bargaining. The employer in *Aroostook*, by contrast, prohibited discussion only of "office business," which the court expressly understood not to.cover the wages, hours, and working conditions of employees. 81 F.3d at 212–13. Considering the terms of the confidentiality policy in this case, the Board reasonably applied the standard set forth in *Lafayette Park*, namely, whether a rule "would reasonably tend to chill employees in the exercise of their Section 7 rights," 326 N.L.R.B. at 825.

C. Removal of the union meeting notice

■ The Hospital argues that the General Counsel lacked authority to include in the complaint the allegation that removing the notice of a union meeting violated § 8(a)(1) because the removal was neither the subject of nor closely related to any unfair labor practice charge filed by the Union. Section 10(b) of the Act, 29 U.S.C. § 160(b), gives the Board the power to issue a complaint only when "it is charged that any person has engaged in or is engaging in any ... unfair labor practice." The Supreme Court has interpreted this provision to allow the Board to prosecute an allegation not charged if it is "related to those alleged in the charge." *NLRB v. Fant Milling Co.,* 360 U.S. 301, 309, 79 S.Ct. 1179, 1184, 3 L.Ed.2d 1243 (1959). Subsequently, this court accepted the Board's position that § 10(b) allows the Board to pursue an uncharged or untimely charged allegation if it is "closely related" to a timely charged allegation, which question turns upon the examination of three factors: whether the two allegations (1) involve the same legal theory; (2) arise from the same factual circumstances or sequence of events; and (3) would elicit similar defenses. *See Drug Plastics & Glass Co. v. NLRB,* 44 F.3d 1017, 1020–21 (D.C.Cir.1995) (uncharged allegation); *Lotus Suites, Inc. v. NLRB,* 32 F.3d 588, 590–91 (D.C.Cir.1994) (uncharged allegation); *Ross Stores, Inc. v. NLRB,* 235 F.3d 669, 672 (D.C.Cir.2001) (allegation in untimely charge).

The Board concedes that the Union did not charge the Hospital with an unfair labor practice involving the removal of the notice but argues that the removal was closely related to the allegation in the timely charge concerning the Hospital's interference with the distributions in March, 1997, and in a charge not otherwise at issue in this petition concerning a negative performance evaluation given to a certain nurse. We conclude that the removal of the notice was not legally or factually related to any charged allegation and that the Board therefore lacked authority to pursue a complaint about it.

As the Board observes, removal of the notice and the prohibition of distribution implicate the same section of the Act, § 8(a)(1), but the specific legal basis for each allegation is different. As the Board itself held, the prohibition of distribution violated the employees' § 8(a)(1) right to distribute union literature in non-work areas, whereas the removal of the notice violated § 8(a)(1) only because the Hospital allowed comparable postings for other causes. *See Brockton Hosp.,* 333 N.L.R.B. No. 165 at 10–11.

Turning to the factual content of the respective allegations, we note that the distribution and removal incidents occurred five months apart, *cf. G.W. Galloway Co. v. NLRB,* 856 F.2d 275, 280–81 (D.C.Cir.1988) (allegations one day apart not factually linked); and there is no indi-

cation that the employee who posted the notice participated in the distributions or that the supervisor who removed the notice in August was involved in stopping the distributions, *cf. Ross Stores*, 235 F.3d at 671–74 (same employee, different supervisor, no factual relatedness). As the Board points out, both incidents occurred as the Union was rallying its troops for contract negotiations, but "[t]he coincidence of ... two separate violations during the same organizing campaign does not of itself create a close factual relationship." *Id.* at 674. So, too, with separate alleged violations during the same pre-bargaining season. The Board's conclusion that the allegations are closely related because they both involve "issues of communications between the Union and unit members and among unit members," *Brockton Hosp.*, 333 N.L.R.B. No. 165 at 11, is pitched at too high a level of generality; two issues may involve such communications and yet be factually poles apart.

Finally, the Board argues that the Hospital's defense of its removal of the notice is similar to one of its defenses of the ban on distribution — namely, there were alternative channels of communication open to the Union and the employees — and to one of its defenses of the negative performance evaluation — to wit, the Hospital had a non-discriminatory reason for its action. As to the former asserted similarity, it is a stretch to say that the Hospital relies upon the availability of "alternative channels of communication" in defense of its removal of the notice; in fact the Hospital's defense is that under their collective bargaining agreement nurses have no right to post notices on their lockers. Even if the Hospital could be said to raise alternative channel defenses to both allegations, however, the alternative channels are not the same, being the bulletin board as an alternative to the lockers and mail and other locations as alternatives to the vestibule. As to the latter claim of similarity, the Board does not even attempt to show that the non-discriminatory justifications offered by the employer in this case are in any way similar beyond being non-discriminatory, which does little to narrow the field.

### III. Conclusion

The Hospital's petition for review is granted with respect to removal of the union notice but denied in all other respects. Accordingly, the Board's cross-petition for enforcement is granted except with respect to removal of the notice.

*So ordered.*