KAREN LECRAFT HENDERSON, Circuit Judge,
concurring in part and dissenting in part:
Conspicuously absent from either the NLRB’s order or the majority opinion is recognition of a poignant reality: nursing homes provide critical care for the most vulnerable Americans. They compose our chronically “sickest” population; “[o]nly a hospital patient would be considered sicker.” Warner-Maron Trial Test. 541. Indeed, their residence in a nursing home typically means that they cannot “live outside an institution” because they “require ... care and supervision.” Id. Many suffer from, “multiple illnesses, comorbidities [and] superimposed cognitive deficits”; accordingly, they depend on caregivers “to bathe, dress, feed, toilet” and “turn” them. Id. And, of particular import for this case, “many of them are vulnerable because of cognitive impairment due to dementia, loss of memory, Alzheimer’s disease” and “medication effects.” Id. at 543. The United States Supreme Court has reminded us that the “patient and his family ... need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one re-mindful of the tensions of the marketplace in addition to the tensions of the sick bed.” NLRB v. Baptist Hosp., Inc., 442 U.S. 773, 783 n. 12, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979). The High Court’s admonition, uniquely fitting in the nursing-home context, ought to animate this case.
*1076 Regretfully, it does not. No record evidence, let alone substantial evidence, supports the Board’s conclusion that Health-Bridge failed to show “a likelihood of ... disruption or disturbance” by allowing, in particular, its nursing staff, inter alia to parade the BUSTED sticker while attending residents. Brockton Hosp. v. NLRB, 294 F.3d 100, 104 (D.C.Cir.2002). Because I cannot join my colleagues’ disposition of this issue,[1]1 respectfully dissent.
I.
The New England Health Care Employees Union, District 1199, SEIU, AFL-CIO (the Union) distributed the BUSTED stickers to many HealthBridge employees, including members of the nursing, maintenance, cafeteria and housekeeping staffs, at HealthBridge’s six nursing-home centers, around 7:00 AM on March 25, 2011 and the employees who donned them did so until about 1:00 PM the same day. The stickers were removed after Lisa Crutch-field, HealthBridge’s Senior Vice President of Labor Relations, ordered them to do so because she feared they would confuse the “elderly, vulnerable folks” living at the facilities. Crutchfield Trial Test. 606. Crutchfield, a HealthBridge employee since November 2005, testified that she works “very closely” with HealthBridge’s nursing-home centers and is in them “very often,” “walking] the floors” and meeting with employees, managers and administrators. Id. at 602-03. Based on this concern — and based on her years of employment in the healthcare industry, including at least ten years at HealthBridge— Crutchfield reasoned that:
the sticker itself says busted with a judge’s gavel. And it’s saying that the center was busted. It suggests some kind of crime. I was concerned that residents ... would not understand this was related to a labor matter and might be concerned for a larger issue. What is happening here at this center? Has this center been convicted of a crime? Is that impacting the care that I’m receiving? So my concern was that residents may be upset by this, may not understand it and it may create confusion and disruption for them.
Id. at 605-06. There is no dispute that Crutchfield’s prohibition applied only in areas where residents frequented; per her instructions, employees were free to wear the stickers elsewhere.[2] The Board did not *1077 counter Crutchfield’s testimony that her primary focus is “to protect those residents and to care for those residents.” Id. at 605.
HealthBridge supplemented Crutch-field’s testimony with that of llene Warner-Maron, a registered gerontological nurse who has worked with the elderly since 1975. Warner-Maron is an adjunct college professor at Saint Joseph’s University in Philadelphia, teaches nursing licensure classes on gerontology and has administered nursing facilities. She has three masters degrees — one in social gerontology, one in health administration and one in law and social policy — and a doctorate degree in health policy. At the time of her testimony, Warner-Maron had been admitted as an expert in fifty-six cases in more than ten states regarding standards of care in the healthcare industry and she had reviewed approximately 2,940 cases in toto. She was qualified as an expert witness in this case without objection.
During her testimony, Warner-Maron first emphasized the obvious — that nursing homes care for “vulnerable adults who have physical and/or cognitive impairment [and] who are dependent on the facility staff to render care, sometimes very personal, intimate care; bathing, grooming, toileting, diapers, those types of things.” Warner-Maron Trial Test. 538. She was “concerned looking at the busted sticker, because of the inference of the word busted.” Id. Specifically, she testified that “[b]usted does not have a positive connotation. It’s strictly negative. It infers something is broken. It could also infer bankruptcy. It can infer arrest. There’s no positive way to interpret the word busted.” Id. (emphasis added). In her expert opinion, a sticker:
with the red word busted as the principle [sic] focus ... being wor[n] on the uniform of employees at chest level, ... the nursing home resident would see that sticker, see that word busted and could easily become agitated, upset, worried, concerned about the inference of that word busted being [used] by their caregiver.
Id. at 538-39. Warner-Maron was not only concerned that the BUSTED sticker could cause harm to the residents; she was also concerned that it could instigate harm by the residents, testifying that the residents might “become upset by this sticker and become agitated and even combative towards the caregivers ... because of the implications of the wording on the sticker.” Id. at 548; see also id. (“[Y]ou don’t want your residents agitated and striking out at the very caregivers that are providing care.”).
According to Warner-Maron, because each BUSTED sticker identified a Health-Bridge facility, the residents would infer that the care centers “violated some law,” which violation “could potentially cause that resident to have to be moved.” Id. at 539. The consequences of such an inference can be dire. During her multi-decade career, Warner-Maron personally observed “transfer trauma,” which occurs when “someone who’s used to being in a facility” is “evacuated to another facility” and experiences “difficulty adjusting.” Id. at 547. Transfer trauma causes, in turn, “an increase in the risk of death, ... depression and psychiatric harm” among nursing-home residents. Id. She emphasized that the fear is “very problematic for people” who know “they can’t return to an independent life in the community” and who are thus “dependent upon a facility to maintain their safety and care.” Id. Based on her experience, transfer trauma can occur when a resident is faced with the *1078 mere “threat of a facility being closed.” Id. (emphasis added).
The Board did not rebut any of the aforementioned testimony. HealthBridge had the burden to demonstrate “only a likelihood of, not actual, disruption or disturbance” to justify barring its employees from wearing the BUSTED sticker in patient-care areas. Brockton Hosp., 294 F.3d at 104; see also Baptist Hosp., 442 U.S. at 781 n. 11, 99 S.Ct. 2598 (“a hospital may overcome the presumption by showing that solicitation is likely either to disrupt patient care or disturb patients” (emphasis added)). The Board has long recognized that a healthcare facility is under no obligation to “wait for the awful moment when patients or family are disturbed by a button before it may lawfully be restricted.” Sacred Heart Med. Ctr., 347 N.L.R.B. 531, 533 (2006), vacated on other grounds by Wash. State Nurses Ass’n v. NLRB, 526 F.3d 577 (9th Cir. ■2008). In my view, HealthBridge’s submission — the uncontroverted testimony of two healthcare professionals explaining why the particulars of the BUSTED sticker were likely to upset HealthBridge residents to the point of an “increase in the risk of death, ... depression and psychiatric harm” — plainly satisfied this burden. Warner-Maron Trial Test. 547. Short of allowing the BUSTED stickers to in fact harm a resident, I cannot think what HealthBridge could have done other than ban the stickers in patient-care areas. See also Baylor Univ. Med. Ctr. v. NLRB, 662 F.2d 56, 62 (D.C.Cir.1981).
II.
Notwithstanding the uncontroverted testimony, the Board found that Health-Bridge failed to establish the BUSTED sticker would likely disturb or disrupt its residents. HealthBridge Mgmt., LLC, 360 N.L.R.B. No. 118 (May 22, 2014). In so doing, it concluded that (A) Crutch-field’s testimony was based on her mere speculative belief and conjecture; (B) HealthBridge’s purported concern for its residents was belied by letters it sent informing them of a labor dispute; and (C) Warner-Maron provided only speculative, after-the-fact testimony about the sticker’s likely effect on residents. See id. The majority agrees, relying (at least in part) on our standard of review. Granted, substantial-evidence review is “limited” and “deferential.” Maj. Op. 1070. But it has never been “so deferential that the court will merely act as a rubber stamp for the Board’s conclusions.” Titanium Metals Corp. v. NLRB, 392 F.3d 439, 445 (D.C.Cir.2004). Indeed, “[w]hen the Board’s findings lack ... support in the record, the reviewing courts must set them aside, along with the orders of the Board that rest on those findings.” Baptist Hosp., 442 U.S. at 782, 99 S.Ct. 2598. Properly understood, “the substantial evidence test requires a case-by-case analysis and a review of the whole record” and it “requires a reviewing court to take into account whatever in the record fairly detracts from the Board’s conclusions.” Wash. State Nurses Ass’n, 526 F.3d at 580 (quotation marks omitted). At bottom, “[w]e review the Board’s application of the law to the facts for reasonableness.” S. New England Tel. Co. v. NLRB, No. 11-1099, 793 F.3d 93, 96, 2015 WL 4153873, at *2 (D.C.Cir. July 10, 2015).
The majority’s analysis, which largely tracks that of the Board, allows the Board to apply “the ‘special circumstances’ except tion in an unreasonable way.” Id. at 96, 2015 WL 4153873 at *3. By repeating many of the same factual, legal and analytical errors (while adding a few of its own), my colleagues endorse the Board’s placing of “an unreasonably high and unrealistic burden” on all healthcare facilities, one that would require them to wait and see whether union activity in fact harms its residents before .prohibiting the same in *1079 patient-care areas. HealthBridge Mgmt., LLC, 360 N.L.R.B. No. 118 (Miscimarra, concurring in part and dissenting in part). I agree with the dissenting Board member that the Board’s decision defies “experience, intuitive reasoning and common sense.” Id.; see also S. New England Tel. Co., 793 F.3d at 94, 2015 WL 4153873, at *1 (“Common sense sometimes matters in' resolving legal disputes.”). And on further examination, the reasons on which my colleagues rely collapse under their own weight.
A.
My colleagues discredit Crutchfield’s belief that “residents who saw the stickers would not understand this was related to a labor matter and might fear the Centers had been convicted of a crime,” observing that the stickers state that HealthBridge had been busted by the “National Labor Board For Violating Federal Labor Law.” Maj. Op. 1070 (emphases in original) (quotation marks omitted). I believe their skepticism is unfounded. The record is replete with evidence documenting the extraordinary difficulties that nursing-home residents face, “both on the physical and on the cognitive aspect.” Warner-Maron Trial Test. 542; see also, e.g., id. at 538-40, 547; Crutchfield Trial Test. 602-06. In my view, it is wholly unreasonable to presume that elderly residents who depend on staff “to bathe, dress, feed, toilet” and “turn” them can appreciate the difference between a violation of the National Labor Relations Act and a violation of any other law. Warner-Maron Trial Test. 541. Simply because my colleagues understand that “[a]n employer’s violation of labor law is quite different from a criminal conviction” does not mean that elderly, ill residents — assuming they are physically able to read — can appreciate the difference. Maj. Op. 1070.
Even if we assume that HealthBridge’s residents have a nuanced understanding of federal law, the majority mistakes the gravamen of Crutchfield’s concern. She did not. fear that HealthBridge’s residents would misunderstand the substance of an alleged legal violation (ie., criminal law, labor law or something else), or even the victim thereof (ie., a resident, an employee or someone else). Rather, she was plainly concerned that the BUSTED stickers would cause fear about the consequences of an alleged legal violation — ie., whether a resident would wonder if HealthBridge’s being “BUSTED” would “impact[] the care that I’m receiving?” Crutchfield Trial Test. 606. This concern is the same from a resident’s perspective whether HealthBridge was convicted of a crime, in bankruptcy proceedings or even liable for a labor-law violation. And the unrebutted testimony from Warner-Maron indicates that Crutchfield’s concerns were well-founded: “Q. ... So as a patient I would be concerned I’m going to lose care, correct? A. Lose care, lose safety, lose ... the security of that facility. Yes.” Warner-Maron Trial Test. 558.
B.
My colleagues also find that the Board reasonably concluded it was “irrational” for HealthBridge “to assume that residents would become distraught and traumatized by a two-and-a-half inch, ten-word sticker” but “would be reassured by [its] repeated and detailed letters ... threatening an imminent Union strike.” Maj. Op. 1070. Their conclusion, I fear, both discounts the impact of the BUSTED stickers and exaggerates HealthBridge’s letters and, in so doing, mistakenly equates the two. At bottom, “[t]here’s no positive way to interpret” the BUSTED stickers, Warner-Maron Trial Test. 538, while Health-Bridge’s letters were intended to reassure its residents. Undoubtedly, HealthBridge’s correspondence could have adopted a more neutral tone regarding the labor dispute. *1080 But neither the tone of HealthBridge’s words nor ray colleagues’ characterization of the letters as “drafted exceptionally poorly,” Maj. Op. 1070, detracts from the underlying message HealthBridge wanted its residents and their families to hear, especially in the- two letters it sent before the BUSTED sticker appeared:

First Letter:

• “As you may know, [HealthBridge] has been in negotiations with [the Union] .... We have approached these negotiations with an open mind and a sincere desire to reach an agreement with the Union that will enable us to continue providing the highest quality care and services to you and your fellow residents.”
• “We need to negotiate a contract that reflects the new reality of our industry to ensure that you continue to receive the best possible care.”
• “Let me assure you that our labor negotiators are doing everything possible to avert the possibility of a strike.... Since this Union has a long history of calling strikes, however, we take this matter very seriously and are well prepared in the event the Union moves forward with plans for a strike....”
• We are working with the Department of Public Health and have developed a comprehensive contingency plan to ensure that you continue to receive excellent clinical care and services without interruption in the event of any strike, work stoppage or other labor dispute. We have mobilized our regional operational and clinical teams and are ready with a full complement of replacement staff to manage and run our Center. All food and medical supplies will be available to meet each resident’s individual clinical and nutritional needs. We also have retained a special security team to ensure that you and your family are comfortable and secure.”
• “[I]f the Union should call a strike, our Center’s operations will continue as usual — including admitting new residents.”
1st Ltr. from Administrators to Health-Bridge Resident and Family Member 1 (March 2011) (emphases added).

Second Letter:

• ‘We need to negotiate a new agreement that reflects the reality of our industry today so we can continue providing the highest quality care to you and your fellow residents.”
• “Thus far, we have not received a strike notice from the Union.... Please be assured that we do not want a strike at our Center and our negotiations team is doing everything possible to avert the possibility of a strike.”
• “[I]f the Union should call a strike as they threatened to do in the very first negotiations meeting, we want you to know that we are fully prepared to continue all of our Center’s normal operations.”
• “As we anticipated, due to the current economic climate, we have had a tremendous response to our recruitment of replacement staff in the event we need them. You can feel confident that, if any kind of strike, work stoppage or other labor dispute should occur, we will have a full complement of highly-qualified [sic] replacement staff to run our Center.”
2d Ltr. from Administrators to Health-Bridge Resident and Family Member 1 (March 2011) (emphases added) (underline in original). Simply put, HealthBridge informed its residents — truthfully—that the Union had threatened to strike but that HealthBridge was nonetheless “fully prepared to continue all ... normal opera *1081 tions.” 2d Ltr. at 1. Contrast this positive message with the image that greeted the “elderly, vulnerable folks” living at Health-Bridge’s facilities, Crutchfield Trial Test, 605, on the morning of March 25, 2011:
[[Image here]]
Given the emotional and psychological damage nursing-home residents risk if they perceive the “threat of a facility being closed,” Warner-Maron Trial Test. 547, HealthBridge’s commitment to “ensure that [its residents] continue to receive excellent clinical care and services without interruption in the event of any strike, work stoppage or other labor dispute,” 1st Ltr. at 1, is consistent with common sense and with HealthBridge’s caring concern for them.[3] That the letters placed Health- *1082 Bridge’s negotiating position in a favorable light does not mean that treating them differently from the BUSTED sticker would “sanction a blatant double standard in favor of employers.” Maj. Op. 1071. Far from it. Even the best intentions— and there is no indication that Health-Bridge had anything but good intentions— are not always expressed with superior draftsmanship.
Moreover, the majority sweeps past the wholly unrebutted expert testimony (which makes the self-evident point) that there is plainly a difference between the BUSTED sticker and a letter addressed to a resident. See Warner-Maron Trial Test. 562. The sticker is “very visible.” Id. This “visible threat on the clothing of the aide,” which is “in close proximity to the resident,” is necessarily not removed as is “opening ... and reading a letter.” Id. Further, any potential harm caused by the letters’ content was blunted because “often the letter goes to the family member rather than to the resident, or if it’s brought to the resident it’s brought by the social worker who’s helping that resident read the letter and not just delivering the letter and walking away.” Id.
in my view, the unrebutted record evidence compels the conclusion that Health-Bridge, in sending its letters and in ordering the removal of the BUSTED sticker, acted out of concern for its residents and “likelfy]” avoided an “actual[] disruption or disturbance” at its nursing-care facilities. Brockton Hosp., 294 F.3d at 104; see also Baptist Hosp., 442 U.S. at 781 n. 11, 99 S.Ct. 2598. It should be lauded — not rebuked — for its efforts.
C.
Finally — and perhaps most remarkably — my colleagues assert that Health-Bridge “failed to adduce evidence showing the stickers were objectively disturbing.” Maj. Op. 1071.[4] As discussed, both Crutchfield and Warner-Maron provided extensive testimony regarding the damage the BUSTED sticker would have caused HealthBridge’s residents. The majority’s criticism of their testimony does not withstand scrutiny.
The majority, like the Board, faults Crutchfield for not basing her testimony on “actual interactions with or comments from residents, family members, or employees.” Maj. Op. 1071.[5] It rejects *1083 HealthBridge’s argument that such evidence would require it to demonstrate “actual harm or a disturbance to patients.” Maj. Op. 1072 (quotation mark omitted). But my colleagues make no attempt to explain the difference between “actual harm or a disturbance” (which, they admit, cannot be required) and “specific experience with a patient, family member, or employee” or “specific evidence of harm or likelihood of harm to patients from employees wearing the sticker” (which, in their view, is required). Id. In my view, HealthBridge did all it could short of waiting “for the awful moment when patients or family are disturbed by a button” before acting to prevent potentially serious injury to, or distress, its residents. Sacred Heart Med. Ctr., 347 N.L.R.B. at 533.[6] The majority’s position may force hospitals and healthcare facilities to inch closer and closer to actual harm to generate evidence “specific” enough to defend against an unfair-labor-practice charge. Maj. Op. 1072.
The majority’s rejection of WarnerMaron’s testimony fares no better. Like the Board, my colleagues demand that Warner-Maron’s opinion be “informed by actual information about or experience with the facilities, their staff, or their patients or by speaking to patients, family members or care givers.” Maj. Op. 1072 (quotation marks omitted). Their demand misconstrues elementary principles of expert testimony.[7] “Unlike an ordinary witness, an expert is permitted wide latitude *1084 to offer opinions, including those that are not based on firsthand knowledge or observation.” Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (emphasis added) (citation omitted); see also United States v. Mejia, 597 F.3d 1329, 1339 (D.C.Cir.2010) (same); Peteet v. Dow Chem. Co., 868 F.2d 1428, 1432 (5th Cir.1989) (“A personal examination of the person or object of the expert’s testimony is not required”); Sementilli v. Trinidad Corp., 155 F.3d 1130, 1134 (9th Cir.1998); Sweet v. United States, 687 F.2d 246, 249 (8th Cir.1982); David H. Kaye et al., The New Wigmore: A Treatise on Evidence, § 4.2 (expert witnesses “are exempted from the traditional personal-knowledge requirements, and may therefore give opinions without personal knowledge of the underlying facts”); 3 D. Louisell & C. Mueller, Federal Evidence § 389, at 657 (1979) (Fed.R.Evid. 703 “diminishes the need for the expert to have firsthand knowledge concerning the matters in issue”).
Indeed, “firsthand observations” constitute but one of “three categories of materials” that “may form the basis for expert judgments.” David H. Kaye et al. The New Wigmore: A Treatise on Evidence, § 4.1. The other two include reviewing materials presented at trial and materials furnished outside court. Fed.R.Evid. 703 advisory committee’s note (1972). WarnerMaron viewed the BUSTED sticker before trial and again while testifying, considered the indisputably negative word BUSTED and the other inflammatory imagery on the sticker,[8] applied her expertise and opined that the BUSTED sticker was likely to distress HealthBridge’s residents. Her testimony, then, fits comfortably within the accepted scope of expert opinion. Rather than correcting the Board’s incorrect application of evidentiary rules, my colleagues endorse it. See Maj. Op. 1072 (Warner-Maron’s “speculation, untethered as it was from any patient or staff interviews or visits to the Centers, was of little use in determining why these stickers, in contrast to the insignia nurses have worn in the past, merited prohibition”).[9]
The inescapable implication of the majority’s conclusion is this: because Health-Bridge allowed its employees to display other union insignia in patient-care areas in the past, it had to identify a resident (or a family member) who had seen the *1085 BUSTED sticker (or perhaps similarly inflammatory union insignia) and reacted adversely to it in order to prohibit its employees from wearing the BUSTED sticker. The Supreme Court,[10] this Court[11] and the Board[12] have made plain that this is not the law.
III.
I end where I began. The Supreme Court has commented that “the patient and his family ... need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed.” Baptist Hosp., 442 U.S. at 783 n. 12, 99 S.Ct. 2598. Then-Chief Justice Burger, writing separately in Baptist Hospital, believed that “no ‘evidence’ is needed to establish the proposition that the primary mission of every hospital is care and concern for the patients' and that anything which tends to interfere with that objective cannot be tolerated.” Id. at 791, 99 S.Ct. 2598 (Burger, C.J., concurring in judgment) (emphasis added). And more than three decades after Baptist Hospital, Warner-Maron, in explaining the nature of the caregiver/nursing-home resident relationship, underscored why care and concern for residents must take priority:
[B]ecause of the intimate nature of the interaction between the caregiver and the resident, the caregiver has to be able to have a rapport with that resident. That resident has to be able to trust, in their most naked form, because they are in their most naked form, during most of this care, that the caregiver will provide safe, competent care to them. So it’s a very personal relationship between the [caregiver] and the resident.
Warner-Maron Trial. Test. 544.
The Union’s BUSTED sticker display interfered with this intimate and personal relationship in a callous and dangerous manner. HealthBridge acted reasonably, legally and compassionately to prohibit its employees from wearing the BUSTED sticker in patient-care areas. In my view, it met its burden before the Board as well as its burden — before us — of establishing that the Board’s contrary conclusion fails the substantial-evidence test. Accordingly, I respectfully dissent.

. Two of the six HealthBridge centers apparently banned the BUSTED sticker in all areas, despite Crutchfield’s instruction that displaying the sticker was permissible in non-patient- *1077 care areas. I agree with my colleagues that HealthBridge failed to argue in support of the two centers' total ban. See Maj. Op. 1073 n. 8.

. The majority notes that “HealthBridge's own expert conceded on cross-examination that communications to residents that imply that they might lose the care of ... their direct care provider could constitute emotional abuse.” Maj. Op. 1070-71 (ellipses in original) (quotation marks omitted). Read in context, however, her testimony did not suggest an equivalency between HealthBridge’s letters and the BUSTED sticker:
Q. So if I told a patient hey, tomorrow none of the [caregivers] that you ... know, are familiar with, are going to be here and there’s going to be brand new people taking care of you—
A. It would be upsetting. I don’t know if that would rise to the level of emotional abuse, but depending on that individual, if that individual had a relationship with particular aides and the loss of that aide or those aides would cause them to become emotionally in despair, then for that individual it may be a form of abuse, yes.
Q. I mean it would be emotionally abusive, don’t you think, if I went to bed one night with my [caregiver], and the next morning I woke up, and she wasn’t there and some stranger was there?
A. Well, that’s the nature of working in institutions. You don't always have the same people taking care of you. But ... people move in and out of the industry frequently. We try to minimize turnover whenever we can, but we don't want to force the turnover of people. We don’t want to cause people to feel that the people that they've associated with for periods of time are going to be lost to them for some purposeful reason.
Warner-Maron Trial Test. 560. In other words, Warner-Maron acknowledged that some nursing-home residents experience distress because their caregivers are at times temporary but that it is impossible to avoid this type of stress in all instances. WarnerMaron’s testimony on this point contrasts sharply with her opinion that "the wording of [the BUSTED sticker], and the type and the red writing of it, with the gavel underneath, is easily viewed as an implied threat that some *1082 thing is amiss, that something is wrong, that there’s something threatening.” Id. at 559.

. My colleagues contrast the evidence here with that in Baptist Hospital, a Supreme Court case in which hospital employees testified that "anytime we do anything that lets a patient or [his] family see that we have our mind on anything but patient care, this is veiy disruptive to the patient and sometimes affects the patient's ability to recover.” 442 U.S. at 783, 99 S.Ct. 2598 (emphasis added). But there is no daylight between Baptist Hospital and HealthBridge in this regard. The Baptist Hospital employees’ testimony applies fully to the residents of the HealthBridge facilities. I fail to see how requiring WarnerMaron to question HealthBridge residents to gauge the severity of their impairments would be constructive. Cf. Maj. Op. 1071. Rather, the testimony the Supreme Court highlighted in Baptist Hospital underscores that all patients and all families, including those at HealthBridge facilities, "need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sick bed.” 442 U.S. at 783 n. 12, 99 S.Ct. 2598.

. The majority also criticizes Crutchfield as merely "an attorney who testified that her duties are to oversee the development of labor relations strategy, human resources, and implementation of collective bargaining agreements.” Maj. Op. 1071 (quotation marks omitted). I note that the Supreme Court, in Baptist Hospital, relied not only on medical witnesses but also on the "Hospital's Vice President for Personnel Services,” who testified that the rule limiting union activity in that case "was adopted because of concern about the ill effects of union organizational activity on patients” and that ”[t]he general *1083 purpose of the rule ... [wa]s to protect the patients and their families from the disquiet that might result if they perceived that the Hospital’s staff had concerns other than the care of patients.” 442 U.S. at 782-83, 99 S.Ct. 2598. At a minimum, the High Court’s reliance on a non-medical witness suggests that the testimony of a ten-year HealthBridge employee who works "very closely with the centers” and is "in the centers very often,” "walk[ing] the floors” and “spendfing] time meeting” with employees, managers and administrators should not be so easily cast aside. Crutchfield Trial Test. 602-03.

.My colleagues fault Crutchfield for failing to "differentiate the 'busted' stickers from other insignia HealthBridge had permitted in the past.” Maj. Op. 1071. They ignore WarnerMaron's testimony on that precise issue:
Q. ... did you have the same expert opinion regarding any of the other buttons or stickers that you reviewed?
A. No, I had no trouble with any of those other[ ] stickers.
Q. And why is that?
A. The other stickers don’t have that wording. They don't have that connotation. They don't threaten. Even the exhibit 9 with the Grinch, the intent is to of course bring attention to the Union, but it’s not threatening. It's a picture of a cartoon character. So I didn’t find anything in the other stickers in any way to be threatening, to exhibit any kind of potential for emotional abuse on the part of a resident, none of these, just the one that says busted in red with the gavel and the words underneath it inferring that the nursing home has violated a law.
Q. And what about General Counsel's exhibit 4, the one that says fight in it, does that make any difference?
A. I think the way that the fight is, it’s couched between a vision, a fight and union, and I did not take away ... the inference that this sticker meant that the aide should fight or that there’s an ongoing fight going on. So I think the way that the word fight is positioned between vision and union does not have anywhere near the same effect as the sticker that we’re talking about with the word busted. Warner-Maron Trial Test. 540-41. As with much of HealthBridge’s evidence, the Board made no attempt to rebut it, instead ignoring or dismissing it. Our responsibility, however, is to "take into account whatever in the record fairly detracts from the Board’s conclusions.” Wash. State Nurses Ass'n, 526 F.3d at 580 (quotation marks omitted).

.The Board, per regulation, generally applies the Federal Rules of Evidence. See 29 C.F.R. § 102.39 (“Any ... proceeding shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States....”).

. Both the Board and the majority criticize Warner-Maron because she searched Google for the word “busted.” See Maj. Op. 1072 & n. 7 (quoting Pet'r’s Reply Br. 10 n. 2). Neither, however, suggests that there is any “positive way to. interpret the word busted.” Warner-Maron Trial Test. 538.

. The majority suggests that my point about Warner-Maron's expert testimony “is misplaced,” noting that the Board "was entitled to determine the weight it would accord Warner-Maron’s evidence.” Maj. Op. 1072 (emphasis in original). But notwithstanding the "weighing of expert opinions is the province of the ALJ, there must be some indication in the ALJ's decision that the weighing was conducted in a reasoned manner.” Peabody Coal Co. v. Dir., Office of Workers' Comp. Programs, 972 F.2d 178, 182 (7th Cir.1992). Indeed, "it makes little sense to use scientific standards in performing the gatekeeping function [at the admissibility stage] and then permit the dispute on the merits to be resolved by arbitrary considerations.” Peabody Coal Co. v. McCandless, 255 F.3d 465, 469 (7th Cir.2001). In my view, discounting out-of-hand expert testimony because it was not based on firsthand observations is arbitrary, especially in the absence of contrary testimony. For this reason, my colleagues’ plea for deference rings hollow. See also Oppenheim v. Finch, 495 F.2d 396, 398 (4th Cir.1974) (vacating and remanding because, inter alia, “[t]h[e] expert judgment is neither met nor contradicted by any other expert judgment”). The ipse dixit label the majority attempts to fix on Warner-Maron’s testimony, see Maj. Op. 1072, is a much closer fit on the Board — the decision-maker whose only reasoning is "because we say so.”

. Baptist Hosp., 442 U.S. at 781 n. 11, 99 S.Ct. 2598 ("[A] hospital may overcome the presumption by showing that solicitation is likely either to disrupt patient care or disturb patients." (first emphasis added)).

. Brockton Hosp., 294 F.3d at 104 ("[T]he Hospital had to show only a likelihood of, not actual, disruption or disturbance.”).

. Sacred Heart Med. Ctr., 347 N.L.R.B. at 533 (“[A] hospital need not wait for the awful moment when patients or family are disturbed by a button before it may lawfully be restricted.”).